UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Thomas Howard Bryan,

    Plaintiff,

           v.                                              Civil Action No. 5:16-cv-157-gwc-jmc

Lisa Menard, Steven Fisher,
Shannon Marcoux, Greg Hale, and
Jane or John Doe as Regional Medical
Director for Correct Care Solutions,

    Defendants.

## REPORT AND RECOMMENDATION
(Doc. 77)

Plaintiff Thomas Bryan, proceeding *pro se*, brings this action under 42 U.S.C. § 1983, alleging that he was denied medical care for a ruptured tympanic membrane (eardrum) in violation of the Eighth Amendment, and retaliated against for filing grievances and the instant lawsuit, while in custody of the Vermont Department of Corrections (DOC). (Doc. 72.) Bryan names DOC Commissioner Lisa Menard, Northern State Correctional Facility (NSCF) Superintendent Shannon Marcoux, Northwest State Correctional Facility (NWSCF) Superintendent Greg Hale,[1] Centurion Regional Medical

---

[1] As of April 2017, Correct Care's filings do not indicate that Bryan has ever been incarcerated at NWSCF. (*See* Doc. 77-14 at 2 (Declaration of Cullen Bullard, Classification Division Director for the DOC, noting that Bryan was transferred from NSCF to Northeastern Correctional Complex on November 6, 2014, transferred back to NSCF on February 19, 2015, and transferred to Southeast State Correctional Facility in early April 2015).) Accordingly, Bryan's reference to NWSCF in the Second Amended Complaint appears to be misguided. (*See, e.g.*, Doc. 72 at 3, ¶ 6; 6, ¶ 14; 7, ¶¶ 16–17.) The apparent error is of no consequence, however, given that Defendants Menard, Marcoux, Hale, and Fisher do not address it; and the pending Motion does not involve the claims against NWSCF Superintendent Hale.

Director Dr. Steven Fisher, and Regional Medical Director of Correct Care Solutions (Correct Care) Dr. Michael Rapaport,[2] as Defendants in their individual capacities. (*Id.* at 2–4.) Bryan seeks declaratory relief (*id.* at 1, ¶ 1), compensatory relief for his pain and suffering in an amount of at least $1 million "for each Defendant," and any additional relief the Court may deem appropriate (*id.* at 14).

Correct Care has moved for summary judgment under Fed. R. Civ. P. 56 with respect to the claims against Correct Care and Dr. Rapaport, advancing the following arguments: 1) Rapaport was not personally involved in Bryan's medical care and Bryan's injuries were not the result of a policy advanced by Correct Care; 2) Correct Care personnel were not deliberately indifferent to a serious medical need of Bryan's; and 3) the suit is barred by the Prison Litigation Reform Act (PLRA) because Bryan failed to exhaust his administrative remedies. (Doc. 77 at 7–20.) As required by Local Rule 56(a) and (e), Defendants submitted a Statement of Undisputed Material Facts (Doc. 77-1) and informed Bryan of the consequences if he failed to file a responsive statement of disputed material facts with attached documentary evidence (Doc. 77-27). Bryan has not responded to Defendants' Motion and has not filed a statement of disputed material facts or other documentary evidence as required by Local Rule 56(b).

For the reasons set forth below, I recommend that Correct Care's unopposed Motion for Summary Judgment (Doc. 77) be GRANTED and that any claims against Correct Care and Rapaport in the Second Amended Complaint (SAC) be DISMISSED.

---

[2] Although Rapaport is not named in the caption of the Second Amended Complaint, Bryan lists as a defendant "Jane Doe/John Doe Regional Medical Director for Correct Care" in the body of that document (Doc. 72 at 4), and Correct Care advises in its Opposition to Bryan's Motion to Compel that Rapaport was Correct Care's Regional Medical Director during the relevant period (Doc. 87 at 3).

**Background**

The material facts, drawn predominantly from Bryan's SAC[3] (Doc. 72), Correct Care's Statement of Undisputed Material Facts (Doc. 77-1), and various medical records (Docs. 77-4–77-6, 77-9, 77-11–77-12, 77-15–77-17, 77-19–77-23), are summarized as follows. They are undisputed unless otherwise indicated.

Bryan first filed a Healthcare Request reporting pain in his left ear on November 7, 2014. (Doc. 77-1 at 2, ¶ 5; Doc. 77-4 at 2.) He was seen the next day by a nurse—an unknown Correct Care employee—who noted "[n]o signs of anything [or] swelling inside of ear," and who referred him to be seen by a provider for his ear pain and various other ailments. (Doc. 77-4 at 2; *see also* Doc. 77-10 at 3, ¶ 5.) Bryan had access to ibuprofen at that time because it had been prescribed for his other medical conditions. (Doc. 77-1 at 3, ¶ 11; Doc. 77-3 at 12.)

In the months prior to the November 7 request, Bryan had filed numerous Healthcare Requests, describing a myriad of problems including tooth pain, migraines, bowel movement issues, rashes, itchy scalp, and a lump on his back, but he never reported any problems with his ear. (Doc. 77-5 at 2–11.) Bryan continued to file frequent Healthcare Requests from mid-November 2014 through mid-February 2015, with no mention of any medical issues concerning his ear. (Doc. 77-6 at 2–11; Doc. 77-7; Doc. 77-8.) He was consistently seen by nurses and referred to providers within a day or two of filing these complaints. (*See generally id.*) Correct Care's contract with the DOC

---

[3] Bryan reports that his history of a traumatic brain injury could impair his memory and his recollection of the events at issue here. (*See* Doc. 77-3 at 3, 7.)

expired on January 31, 2015.  (Doc. 77-1 at 1, ¶ 1 (citing Doc. 77-2 at 2, ¶ 2) (noting Correct Care-DOC contract timeframe of February 10, 2010 through January 31, 2015).) Bryan did not file another complaint with respect to his ear until February 21, 2015 (Doc. 77-9 at 2), nearly a month after Correct Care's contract with DOC had expired.  At this time, Centurion of Vermont apparently assumed health care services for Vermont inmates and Correct Care was thus not involved in any of the events that followed.  (*See, e.g.*, Doc. 72 at 5; 7, ¶¶ 16, 18; 8, ¶¶ 18–20; 9, ¶ 21.)

In the February 21 Healthcare Request, Bryan states that his ear was in pain because of a "perforated [tympanic] membrane" (or ruptured eardrum) "from several weeks ago."  (Doc. 77-9 at 2.)  He states that he believes the perforation was a result of "over build-up of wax" in his ear.  (Doc. 77-10 at 2, ¶ 4.)  Bryan attempted to clean his ear himself with a homemade Q-tip, after alleged delays in the DOC sick call process.  (Doc. 72 at 5, ¶ 12; *see also* Doc. 77-3 at 17.)  His healthcare providers later opined that the Q-tip could have caused the eardrum rupture.  (Doc. 77-1 at 3, ¶ 15; Doc. 77-12 at 2.) Bryan was seen by Nurse Joann Erdman two days later, on February 23, 2015.  (Doc. 77-9 at 2.)  Erdman examined Bryan's ear, noting redness, swelling, and drainage; and gave Bryan cotton balls to use when showering.  (Doc. 77-9 at 2.)  According to Bryan, he was told the eardrum would heal on its own.  (Doc. 72 at 6, ¶ 12.)  Bryan also indicates that he began to experience hearing loss in his left ear around this time.  (Doc. 77-3 at 13–14.) Erdman instructed Bryan to alert medical staff if he experienced more pain and scheduled a follow-up appointment to evaluate his healing within three to four weeks.  (Doc. 77-9 at 2.)

4

Bryan was seen again on March 13, 2015. (Doc. 77-15 at 2; Doc. 77-18 at 2.) The provider noted that Bryan would be approved for work camp as long as his eardrum had healed. (*Id.*) From mid-March through June 2015, nursing staff continued to respond to medical complaints by Bryan, but there are no records of Bryan reporting any conditions involving his ear during that time. (Doc. 77-17.)

Sometime between April and July 2015, Bryan woke to intensive pain and fluid running out of his ear. (Doc. 72 at 6, ¶ 14; Doc. 77-3 at 14.) He filed a Healthcare Request on June 23, 2015, reporting "issues with [his] left ear" and hearing loss. (Doc. 77-16 at 2.) He was seen the next day by a nurse who did not observe anything in his ear, but placed him on the provider list. (*Id.*) A provider examined Bryan in early July, noting the sudden onset of pain and hearing loss, and some discharge from the ear. (Doc. 77-11 at 2; *see also* Doc. 72 at 6, ¶ 15.) She prescribed antibiotics and ordered a follow-up appointment with an ear, nose, and throat (ENT) specialist. (*Id.*) By August 2015, after repeatedly inquiring about the ENT appointment, Bryan believed that Centurion medical personnel were not taking appropriate steps to treat his ear and he initiated the DOC inmate grievance process. (Doc. 72 at 7, ¶ 16; Doc. 77-25 at 2.) On the informal grievance form, correctional staff indicated that the grievance would be resolved because an ENT appointment had been scheduled. (Doc. 77-25 at 2.)

Bryan submitted the next Healthcare Request related to his eardrum in September 2015 after experiencing fluid leaking from his ear again. (Doc. 77-20 at 2.) A nurse examined Bryan and referred him to a provider. (*Id.*) Bryan had an appointment with ENT specialist Dr. Paul Julien a few weeks later. (Doc. 77-12.) Dr. Julien confirmed the

5

ruptured eardrum diagnosis, prescribed new ear drops, and ordered a follow-up appointment within two months. (*Id.* at 2; Doc. 72 at 7, ¶ 18; Doc. 77-21.) Dr. Julien also informed Bryan "that a tympanic membrane graft could be possible." (Doc. 77-12 at 2.)

On December 30, 2015, Bryan was seen by Centurion's Regional Medical Director Dr. Fisher for a quarterly medical checkup. (Doc. 72 at 8, ¶ 20; *see also* Doc. 77-22 at 2.) Dr. Fisher stated that he had not received records from Bryan's visit with Dr. Julien and that Bryan would need to sign another records release before a follow-up ENT appointment could be scheduled. (Doc. 72 at 8, ¶ 20; Doc. 77-22 at 5.) Dr. Fisher noted that Bryan had refused the ear drops prescribed by Dr. Julien. (Doc. 77-22 at 2.)

Bryan filed a second grievance against Centurion medical staff "claiming neglect due to inadequate medical staff responses and/or treatment," perpetuating Bryan's eardrum infection and hearing loss. (Doc. 72 at 9, ¶ 21.) Bryan states that DOC staff violated grievance procedure deadlines numerous times throughout the grievance process. (Doc. 72 at 9–10, ¶¶ 21–23, 25.) As grievance response deadlines elapsed, Bryan continued to file subsequent grievance forms, ultimately filing a final grievance with Commissioner Menard, who did not respond within the required timeframe. (*Id.* at 10–11, ¶¶ 25–26.)

On May 25, 2016, Bryan was again seen by Dr. Julien, who noted that Bryan was "a candidate for a tympanoplasty," explaining that "[t]he procedure is non[-]urgent but the patient wants it done." (Doc. 77-23 at 2.) Bryan filed the original Complaint in this case about a month later (Doc. 4) and an Amended Complaint on October 27, 2016 (Doc. 20). On April 17, 2017, he filed the SAC that is currently under review. (Doc. 72).

6

**Discussion**

I.  **Summary Judgment Standard**

A motion for summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In other words, "[t]he moving party is entitled to summary judgment where 'the plaintiff has failed to come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor' on an essential element of a claim on which the plaintiff bears the burden of proof." *Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

In considering a summary judgment motion, the court is "'required to resolve all ambiguities and draw all factual inferences in favor of the' nonmovant." *Robinson v. Concentra Health Servs., Inc.*, 781 F.3d 42, 44 (2d Cir. 2015) (quoting *Nationwide Life Ins. Co. v. Bankers Leasing Ass'n*, 182 F.3d 157, 160 (2d Cir. 1999)). If the moving party demonstrates that there are no genuine issues of material fact, the burden then shifts to the nonmoving party, who must present "'significantly probative supporting evidence' of a disputed fact." *Hamlett v. Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). He "cannot defeat summary judgment by relying on the allegations in his complaint, conclusory statements, or mere

assertions that affidavits supporting the motion are not credible." *Hamlett*, 496 F. Supp. 2d at 328 (citing *Gottlieb v. County of Orange*, 84 F.3d 511, 518 (2d Cir. 1996)); *see also Dasher v. N.Y.C. Police Dep't*, No. 94 CV 3847(SJ), 1999 WL 184118, at *1 (E.D.N.Y. Mar. 18, 1999) ("[T]he court should grant summary judgment where the nonmoving party's evidence is merely colorable, conclusory, speculative, or not significantly probative.").

Because Bryan is proceeding *pro se*, in addition to resolving all ambiguities and drawing all factual inferences in his favor, the Court also "must interpret his papers liberally 'to raise the strongest arguments that they suggest.'" *Willey v. Kirkpatrick*, 801 F.3d 51, 62 (2d Cir. 2015) (quoting *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994)). Still, *pro se* litigants like Bryan must meet the "usual requirements of summary judgment, and a *pro se* party's bald assertions, unsupported by evidence, are insufficient to overcome a motion for summary judgment." *Crenshaw v. Herbert*, 445 F. Supp. 2d 301, 303 (W.D.N.Y. 2006) (quoting *Hernandez v. McGinnis*, 272 F. Supp. 2d 223, 226 (W.D.N.Y. 2003)); *see also Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) ("[M]ere conclusory allegations, speculation[,] or conjecture will not avail a party resisting summary judgment." (first alteration in original) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996))).

## II. Personal Involvement

Correct Care argues that the claims against Rapaport should be dismissed because the SAC "does not specifically state any claims against the Regional Medical Director [of Correct Care]" and thus fails to allege Rapaport's personal involvement. (Doc. 77 at 13.)

8

Under 42 U.S.C. § 1983, a claimant may bring suit "against '[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .'" *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (alterations in original) (quoting 42 U.S.C. § 1983). In order to recover damages on a § 1983 claim, a plaintiff must demonstrate the personal involvement of the defendant in the alleged constitutional violations, through evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[4] Personal involvement of a supervisory official "requires a showing of more than the linkage in the prison chain of command; the doctrine of respondeat superior does not apply."[5] *Ayers v. Coughlin*, 780

---

[4] In *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), the Second Circuit recognized that "the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations." *Id.* at 139; *see also Raspardo v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test . . . after *Iqbal*"). Still, the Second Circuit has not specifically overruled *Colon*, and this Court continues to treat it as good law. *See, e.g.*, *Jones v. Pallito*, No. 2:14–cv–199, 2015 WL 2376347, at *5 n.9 (D. Vt. May 18, 2015). In any event, the Court need not reach *Iqbal*'s impact on *Colon* here because no reasonable juror could find that Rapaport was personally involved in Bryan's medical care, even under *Colon*. *See Shaw v. Prindle*, 661 F. App'x 16, 18 n.2 (2d Cir. 2016).

[5] Courts in this circuit have treated supervisory liability claims against directors of private corporations as analogous to cases involving prison supervisors and managers. *Murphy v. N.Y. Racing Ass'n, Inc.*, 76 F. Supp. 2d 489, 502 (S.D.N.Y. 1999); *see also Helijas v. Corr. Med. Care, Inc.*, No. 1:15-CV-1049 (GTS/DJS), 2016 WL 5374124, at *14–15 (N.D.N.Y. Sept. 26, 2016); *Walters v. Hofmann*, Civil Action No. 1:09–CV–84, 2009 WL 6329145, at *6 (D. Vt. Dec. 29, 2009), *report and recommendation adopted in relevant part*, No. 1:09-CV-84, 2010 WL 1403957 (D. Vt. Apr. 2, 2010).

F.2d 205, 210 (2d Cir. 1985) (per curiam); *see also Gonzales v. Wright*, No. 9:06–CV–1424 (JMH), 2010 WL 681323, at *10 (N.D.N.Y. Feb. 23, 2010) ("The mere fact that [defendant] held the position of Medical Director . . . is insufficient to provide the requisite personal involvement to state an Eighth Amendment claim." (citing *Hernandez v. Keane*, 341 F.3d 137, 145 (2d Cir. 2003))).

The personal involvement requirement of § 1983 "does not bar either declaratory or injunctive relief," *Ramirez v. Coughlin*, 919 F. Supp. 617, 623 (N.D.N.Y. 1996), but a prisoner's transfer to a different correctional facility generally moots a request for this type of relief against employees of the transferor facility, *Salahuddin v. Goord*, 467 F.3d 263, 272 (2d Cir. 2006). Similarly, this Court has held that a plaintiff's request for injunctive relief from Correct Care was moot because a new contractor had assumed the provision of healthcare to Vermont inmates. *Rosen v. Pallito*, No. 2:13–cv–277, 2015 WL 4665628, at *8 (D. Vt. Aug. 6, 2015).

Bryan's sole allegation against Rapaport is that he "was legally obligated and responsible to give [m]edical care to all Vermont prisoners," pursuant to Correct Care's contract with the DOC, but was deliberately indifferent to this responsibility, "neglect[ing]" Bryan's well-being and "clear[ly] documented injury." (Doc. 72 at 4, ¶ 8.) But Correct Care was only under contract with the DOC on one date (of many) that Bryan reported ear pain—November 7, 2014. (Doc. 77-4 at 2; *see also* Doc. 77-2 at 2, ¶ 2.) As noted above, a Correct Care nurse examined Bryan the day after he filed this Healthcare Request, did not observe any medical problems, and referred Bryan to a provider. (Doc. 77-4 at 2; Doc. 77-10 at 3, ¶ 5.) Correct Care's contract expired on January 31, 2015

10

(Doc. 77-1 at 1, ¶ 1; Doc. 77-2 at 2, ¶ 2), and Bryan did not report any issues with his ear again until February 21, 2015 (Doc. 77-9 at 2). By contrast, Bryan specifically alleges that other Defendants became aware of his ear condition through the grievance process or through their direct participation in his medical care, naming every Defendant other than Rapaport and Correct Care in the three counts of his SAC. (Doc. 72 at 11–12, ¶¶ 28–31 (faulting Menard, Marcoux, and Hale for breaching their "duty to protect"); *id.* at 12–13, ¶¶ 32–33 (alleging Fisher's failure to provide adequate medical treatment); *id.* at 13, ¶¶ 34–35 (claiming that Hale has retaliated against Bryan for filing grievances and the present suit).)

Bryan's single, conclusory mention of Correct Care's Regional Medical Director is insufficient to defeat summary judgment on personal involvement. *See Hamlett*, 496 F. Supp. 2d at 328; *Dasher*, 1999 WL 184118, at *1. Under the first two *Colon* factors, the SAC does not set forth any facts demonstrating that Rapaport actually knew, or should have known, about the allegedly unconstitutional medical treatment. *See Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (finding corrections commissioner was not liable because he "was never put on actual or constructive notice of the violation"). Bryan also does not make any claim or present any evidence suggesting Rapaport's personal involvement under the third, fourth, or fifth *Colon* factors: he does not claim that Rapaport created a custom of, or a tolerance for, constitutional violations; was grossly negligent in his supervision of others involved in the constitutional violations; or deliberately ignored information regarding the alleged violations of Bryan's rights.

Though personal involvement is not a prerequisite for declaratory or injunctive relief, any such claim against Rapaport is moot because Correct Care no longer provides medical care to DOC inmates, and there is no reason to expect that Correct Care will have any control over Bryan's healthcare in the future. *See Rosen*, 2015 WL 4665628, at *8; *Walters v. Hofmann*, Civil Action No. 1:09–CV–84, 2009 WL 6329145, at *4 (D. Vt. Dec. 29, 2009), *report and recommendation adopted in relevant part*, 2010 WL 1403957 (D. Vt. Apr. 2, 2010).

Correct Care additionally argues that it cannot be liable as an entity for any alleged constitutional violations by its employees because "there is no evidence that any shortcoming in Bryan's care was the product of a Correct Care policy." (Doc. 77 at 11.) "Private employers are not liable under § 1983 for the constitutional torts of their employees . . . unless the plaintiff proves that 'action pursuant to official . . . *policy* of some nature caused a constitutional tort.'" *Rojas v. Alexander's Dep't Store, Inc.*, 924 F.2d 406, 408 (2d Cir. 1990) (alterations in original) (citations omitted) (quoting *Monell v. Dep't of Soc. Serv. of the City of N.Y.*, 436 U.S. 658, 691 (1978)); *see also id.* at 409 ("Although *Monell* dealt with municipal employers, its rationale has been extended to private businesses." (collecting cases)). A policy or custom can be explicitly established in an adopted rule or regulation, or may exist if the "violative practice is 'persistent and widespread,'" and if the acts of subordinate employees "imply the constructive acquiescence of senior policy-making officials." *Lipton v. County of Orange*, 315 F. Supp. 2d 434, 453 (S.D.N.Y. 2004) (quoting *Sorlucco v. N.Y.C. Police Dep't*, 971 F.2d 864, 870–71 (2nd Cir. 1992)). Assuming Bryan's SAC includes claims against Correct

Care, the claims fail, given that Bryan has not advanced evidence of any explicit or implicit policy of persistent constitutional violations by Correct Care.

Accordingly, I recommend that Correct Care's Motion be GRANTED, insofar as it seeks dismissal of Bryan's claims for monetary damages and declaratory relief against Rapaport in his individual capacity.

### III.  Eighth Amendment Claims

Even assuming Rapaport was personally involved in Bryan's medical treatment, no reasonable juror could find that Bryan's Eighth Amendment rights were violated by either Correct Care or Rapaport.  As Correct Care argues, "the evidence simply cannot establish that Bryan's condition during Correct Care's tenure was 'sufficiently serious' to support an Eighth Amendment claim, nor that Correct Care deprived him of adequate medical care."  (Doc. 77 at 9.)

The Eighth Amendment, which applies to state prisoners through the Fourteenth Amendment, *see Caiozzo v. Koreman*, 581 F.3d 63, 69 n.3 (2d Cir. 2009), guarantees inmates access to adequate medical care, *Salahuddin*, 467 F.3d at 279, and prohibits "deliberate indifference to [their] serious medical needs," *Spavone v. N.Y. State Dep't of Corr. Servs.*, 719 F.3d 127, 138 (2d Cir. 2013) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)).  A prisoner claiming a violation of his Eighth Amendment rights must allege both objective and subjective deliberate indifference.  *Id.*  "The objective component requires that 'the alleged deprivation . . . be sufficiently serious, in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists.'" *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011) (quoting *Hathaway v. Coughlin*, 99

F.3d 550, 553 (2d Cir. 1996)). Under the subjective test, the plaintiff must demonstrate that the prison official acted with "deliberate indifference to inmate health or safety," *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994)), meaning that the official acted or failed to act "while *actually aware* of a substantial risk that serious inmate harm will result," *Spavone*, 719 F.3d at 138 (quoting *Salahuddin*, 467 F.3d at 280). Neither "negligen[ce] in diagnosing or treating a medical condition," *Estelle*, 429 U.S. at 106–07, nor the inmate's "mere disagreement over the proper treatment," *Chance v. Armstrong*, 143 F.3d 698, 703 (2d Cir. 1998), give rise to an Eighth Amendment claim. *See also Nails v. Laplante*, 596 F. Supp. 2d 475, 480 (D. Conn. 2009) ("Inmates do not have a constitutional right to the treatment of their choice."); *Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.").

There is no genuine dispute of material fact with respect to Bryan's Eighth Amendment claims against Correct Care. Under the objective requirement, the record demonstrates that Bryan was not in fact deprived of necessary medical care and that his ear condition was not sufficiently serious. Bryan first reported ear pain on November 7, 2014 and was promptly seen by a Correct Care nurse the next day. (Doc. 77-4 at 2; Doc. 77-10 at 3, ¶ 5.) Bryan admits (*see* Doc. 77-3 at 6) that the nurse did not observe swelling or any other potential problems in Bryan's ear (Doc. 77-4 at 2), and referred him to a provider for his ear pain and various other medical complaints (*id.*; *see also* Doc. 77-10

14

at 3, ¶ 5). Bryan had access to Ibuprofen at that time. (Doc. 77-1 at 3, ¶ 11; Doc. 77-3 at 12.) From mid-November through January 2015, Correct Care nursing staff and doctors saw Bryan on at least 13 separate occasions, always within a day or two of Bryan filing a Healthcare Request. (*See generally* Doc. 77-6 at 2–11; Doc. 77-7; Doc. 77-8.) There is no record of Bryan mentioning his ear pain during any of these visits, though Bryan complained extensively about other ailments such as migraines, pain from dental fillings, depression, difficulty sleeping, and a foot infection. (*See id.*) Bryan did not file another complaint with respect to his ear until February 21, 2105 (Doc. 77-9 at 2), nearly a month after Correct Care's contract with the DOC had expired (Doc. 77-2 at 2, ¶ 2), and when Centurion had assumed health care services for Vermont inmates (*see, e.g.*, Doc. 72 at 5; 7, ¶¶ 16, 18; 8, ¶¶ 18–20; 9, ¶ 21). Several more months elapsed before Bryan's ear condition caused him extreme pain sometime between April and July of 2015. (*Id.* at 6, ¶ 14; Doc. 77-3 at 14.) No reasonable juror could conclude that Bryan's ear condition threatened "death, degeneration, or extreme pain" during Correct Care's tenure as DOC's healthcare provider, and thus there was no Eighth Amendment violation. *Hill*, 657 F.3d at 122.

Under the subjective prong of the Eighth Amendment test, the undisputed evidence reveals that, far from disregarding Bryan's ear condition, Correct Care nurses and providers regularly saw and treated Bryan; and again, on the single occasion during Correct Care's contract when Bryan reported ear pain, he was promptly seen the next day. (Doc. 77-4 at 2; Doc. 77-10 at 3, ¶ 5.) To the extent Bryan's SAC can be construed to allege disagreements with the treatment provided by Correct Care, these allegations do

15

not amount to Eighth Amendment violations. *See Chance*, 143 F.3d at 703; *Sonds*, 151 F. Supp. at 312.

Accordingly, I recommend that Correct Care's Motion be GRANTED insofar as it seeks dismissal of Bryan's Eighth Amendment claims against Correct Care and Rapaport.

## IV.     Failure to Exhaust

Finally, Correct Care argues that Bryan's claims are barred by the PLRA because he did not properly exhaust his administrative remedies under the DOC grievance process. (Doc. 77 at 15–20.)

The PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 . . . or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Hernández v. Coffey*, 582 F.3d 303, 305 (2d Cir. 2009) (alterations in original) (quoting 42 U.S.C. § 1997e(a)); *see generally Ross v. Blake*, 136 S. Ct. 1850 (2016). Exhaustion must be proper—that is, it must "compl[y] with an agency's deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 90 (2006). In other words, inmates must adhere to the grievance process set out by the institution where they are incarcerated. *Jones v. Bock*, 549 U.S. 199, 218 (2007) ("[I]t is the prison's requirements, and not the PLRA, that define the boundaries of proper exhaustion."). The DOC administrative grievance procedure is set forth in Directive 320.01. (Doc. 77-24 (*State of Vt. Agency of Human Servs., Dep't. of Corr. Servs.: Directive #320.01 Offender Grievance Sys. for Field & Facilities* (2007), *available at* http://www.doc.state.vt.us/about/policies/pdu-general/rpd/correctional-services-301-

16

550/301-335-facilities-general/320.01.pdf).) This Directive requires inmates to first "voice a verbal complaint" or file an informal grievance form, within ten "business days after the event or discovery of the cause of the complaint," in order to initiate the grievance process. (*Id.* at 6.) The Directive provides limited exceptions to the informal grievance requirement, and the timing of its filing, but none are applicable here. (*See id.* at 7–8.)

By Bryan's own admission, he filed his first informal grievance (Grievance Form #1) on August 11, 2015 (Doc. 72 at 4, ¶ 10), over six months after Correct Care's contract with the DOC had expired. Bryan subsequently filed additional grievances (*id.* at 4–5, ¶ 10), but none of them concerned Rapaport, Correct Care personnel, or events that occurred during the pendency of Correct Care's contract. (*Id.*; *see also id.* at 7, ¶ 16 (Bryan explaining that he initiated the grievance process after "Centurion of Vermont [m]edical staff . . . neglect[ed] [his] serious medical needs" (emphasis omitted)); Doc. 77-26.) Accordingly, no reasonable juror could find that Bryan has properly exhausted his administrative remedies under the PLRA with respect to Correct Care or Rapaport.

I therefore recommend that Correct Care's Motion be GRANTED insofar as it seeks dismissal of Bryan's claims against Correct Care and Rapaport under the PLRA.

## V. Leave to Amend

Finally, I recommend that the Court refrain from granting Bryan leave to amend his complaint for a third time. In general, district courts should not dismiss *pro se* complaints with prejudice without granting leave to amend at least once, "when a liberal reading of the complaint gives any indication that a valid claim might be stated."

17

*Thompson v. Carter*, 284 F.3d 411, 416 (2d Cir. 2002) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires."). It is well settled, however, that "leave to amend a complaint need not be granted when amendment would be futile." *Ellis v. Chao*, 336 F.3d 114, 127 (2d Cir. 2003); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that a "futile request to replead," even by a *pro se* litigant, "should be denied"). Amendment is futile when the cause of action is substantively flawed and better pleading will not cure its defects. *Cuoco*, 222 F.3d at 112; *see also Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).

Bryan has already had two opportunities to amend his complaint in this matter. (*See* Docs. 13, 20, 68, 72.) Further amendment of Bryan's claims against Correct Care or Rapaport would be futile for the reasons explained above. I therefore recommend that the Court decline to grant Bryan leave to amend his SAC.

## Conclusion

For foregoing reasons, I recommend that the Court GRANT Correct Care's Motion for Summary Judgment (Doc. 77) and DISMISS the SAC's claims against Correct Care and "Jane or John Doe as Regional Medical Director for Correct Care Solutions," identified by Defendants as Dr. Michael Rapaport, with prejudice.

Dated at Burlington, in the District of Vermont, this 19th day of June, 2017.

/s/ John M. Conroy<br>
John M. Conroy<br>
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections. *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c). Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).