UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Thomas Howard Bryan,

       Plaintiff,

          v.                          Civil Action No. 5:16-cv-157-gwc-jmc

Lisa Menard, Shannon Marcoux,
Greg Hale, and Steven Fisher, M.D.,

       Defendants.

## REPORT AND RECOMMENDATION
(Doc. 103)

Plaintiff Thomas Howard Bryan, proceeding *pro se*, brings this action under 42
U.S.C. § 1983 against Defendants Lisa Menard, commissioner of the Vermont
Department of Corrections; Shannon Marcoux, superintendent of Northern State
Correctional Facility (NSCF); Greg Hale, superintendent of Northwest State
Correctional Facility (NWSCF); and Steven Fisher, M.D., Centurion regional medical
director, each in their individual capacities.  (Doc. 72 at 2–4.)  Bryan alleges in his
Second Amended Complaint that, while in custody of the Vermont Department of
Corrections (DOC), he was denied medical care for a ruptured tympanic membrane
(eardrum) in violation of the Eighth Amendment, and that Defendants Menard,
Marcoux, and Hale retaliated against Bryan for filing DOC grievances and the
instant lawsuit.  (*Id.*)  Bryan seeks declaratory and injunctive relief (*id.* at 14),
monetary damages for his pain and suffering, and any additional relief the Court
may deem appropriate.  (*Id.*)

Presently before the Court is Defendants' Motion for Summary Judgment under Fed. R. Civ. P. 56. (Doc. 103.) Defendants argue that Bryan's medical care did not violate the Eighth Amendment and that Bryan's retaliation claim is barred by the Prison Litigation Reform Act (PLRA) because he failed to exhaust his administrative remedies and that, in any event, his retaliation claim fails on the merits. (Doc. 103 at 11–18.) Bryan opposes Defendants' Motion, contending that there is a genuine dispute of material fact as to whether Defendants were deliberately indifferent to his serious medical need and as to whether Defendants retaliated against him for filing grievances and this § 1983 action. Bryan also argues that his retaliation claim should go forward because the DOC's grievance process is a "dead end" and therefore offers no available remedy for Defendants' alleged retaliation. (Doc. 104 at 13.)

As explained below, I conclude that Bryan lacks standing to bring his claims for equitable relief. Furthermore, I conclude that there are no genuine issues of a material fact remaining for trial and that the alleged deficiencies in his medical care do not rise to the level of a constitutional deprivation. Finally, I conclude that Bryan's First Amendment retaliation claim is without merit. Therefore, I recommend that Defendants' Motion for Summary Judgment (Doc. 103) be GRANTED.

## Factual and Procedural Background

The material facts are primarily drawn from Bryan's Second Amended Complaint (Doc. 72), Defendants' Statement of Undisputed Material Facts (Doc.

2

103-1), and various affidavits, medical records, and DOC records supporting Defendants' Statement of Undisputed Material Facts. (Docs. 103-2–103-13). They are undisputed unless otherwise indicated.

## I.    Bryan's Eardrum

### A.    Medical Provider

The DOC contracts with managed care companies to provide medical and mental health care to inmates housed in Vermont. (Doc. 103-3 at 2, ¶ 1.) From February 1, 2010 to January 31, 2015, Correct Care Solutions served as the medical provider for the DOC.[1] (Doc. 77-2 at 2, ¶ 2.) On February 1, 2015, Centurion of Vermont, LLC (Centurion) began a contract with the DOC. (Doc. 103-3 at 2, ¶ 1.) Defendant Dr. Steven Fisher is the regional medical director for Centurion; prior to becoming medical director, Dr. Fisher was the medical provider at NSCF.

### B.    Injury and Medical Treatment

In early November 2014, when Bryan first reported discomfort in his ear, he was incarcerated at NSCF, where defendant Shannon Marcoux is the superintendent. (Doc. 103-1 at 2, ¶ 5; Doc. 79 at 1, ¶ 5). According to Bryan, his ear problems began "[o]n or about the end of October 2014, to the earliest part of November 2014, while in the custody and care of the Defendant Lisa Menard," who is the commissioner of the DOC. (Doc. 72 at 5, ¶ 12.) He claims that he attempted to

---

[1] Bryan originally brought a § 1983 action against Correct Care Solutions and Correct Care filed a Motion for Summary Judgment in response. (Doc. 77.) On June 19, 2017, this Court recommended that Correct Care's Motion for Summary Judgment be granted. (Doc. 90.) The Report and Recommendation was subsequently adopted. *Bryan v. Menard*, Civil Action No. 5:16-cv-157-gwc-jmc, 2017 WL 2964008, at *2 (D. Vt. June 19, 2017), *report and recommendation adopted*, 2017 WL 2964807 (D. Vt. July 10, 2017).

contact medical personnel, but that the personnel did not respond.  (*Id.*)  Bryan then used a "Q-tip" to remove wax from his left ear canal, which he believed was causing the pain.  (*Id.*)

A Healthcare Request form indicates that Bryan reported on November 7, 2014, that his left ear hurt and that it "feels like something in ear."  (Doc. 103-4 at 19.)  A nurse saw him the next day regarding his ear pain.  (*Id.*; Doc. 103-1 at 2, ¶ 6.)  The nurse observed no sign of swelling or anything inside the ear, (Doc. 103-4 at 19); as a result, she informed Bryan that she believed he had a ruptured tympanic membrane or eardrum, and that it would heal on its own in a few months.  (Doc. 72 at 6, ¶ 12.)  Although Bryan complained that he was experiencing pain, the nurse did not provide any medication for the pain, aside from ibuprofen that had already been prescribed to Bryan.  (*Id.*; Doc. 77-1 at 3, ¶ 11; Doc. 103-4 at 4.)  The nurse also placed Bryan on a provider list to be seen by a doctor or nurse practitioner for his ear pain, as well as various other health-related issues. (Doc. 103-1 at 2, ¶ 6.)

Subsequently, Bryan filed a number of Healthcare Request forms for different ailments from mid-November 2014 through mid-February 2015, with no mention of any medical issues concerning his ear.  (Doc. 103-4 at 7–28; *see also* Doc. 103-1 at 2, ¶ 8.)  Within a day or two of filing these forms, Harris was seen by a nurse or was referred to a provider.  (*See* Doc. 103-4 at 7–28.)  Although he did not report any issues concerning his ear, Bryan alleges that he was also experiencing constant ear pain during these months.  (Doc. 72 at 5, ¶13.)

4

On February 21, 2015, Bryan submitted another Health Service Request regarding his ear pain, stating that he "would like to see somebody. Ear still hurts from perforated membrane, from several weeks ago." (Doc. 103-3 at 2, ¶ 9; Doc. 103-4 at 29.) Bryan saw a registered nurse (RN) two days later. (Doc. 103-3 at 2, ¶ 10; Doc. 103-4 at 29.) The RN observed redness, swelling, and drainage in Bryan's ear, and gave Bryan cotton balls to use while showering. (Doc. 103-4 at 29.) Again, Bryan claims that he was not provided any medication for his pain. (Doc. 72 at 6, ¶ 13.) The RN scheduled a follow-up visit in three to four weeks to evaluate Bryan's ear pain. (Doc. 103-1 at 3, ¶ 11; Doc. 103-4 at 29.)

Bryan followed up with a nurse practitioner (NP) on March 13, 2015. (Doc. 103-1 at 3, ¶ 12; Doc. 103-4 at 6.) The notes taken by the NP state that Bryan "[d]enie[d] [any] acute issues" during this follow-up. (Doc. 103-4 at 6.) Further, the NP noted that Bryan would likely be approved for work camp provided his eardrum had healed. (*Id.*; Doc. 103-1 at 3, ¶ 13.) To check on the progress of his eardrum, the NP scheduled a telephone follow-up within one week. (Doc. 103-4 at 6.)

According to Bryan, "[a]pproximately one[] month passed" and then he woke to intensive pain and fluid running out of his ear. (Doc. 72 at 6, ¶ 14.) He alleges that he informed medical personnel, who told him that he had a severe ear infection and provided neomycin ear drops. (*Id.*) Although unclear from the record, this incident may be reflected in the Healthcare Request form submitted by Bryan on June 23, 2015. In that form, Bryan stated that he was "[h]aving issues with my left ear. Several months ago I was told that I had a perforated membrane in [left] ear[,] now

5

barely can hear out of it." (Doc. 103-4 at 5.) The next day Bryan saw a nurse. (*Id.*)
The nurse did not observe anything in his ear nor do the nurse's notes describe fluid
in Bryan's left ear. (*Id.*) Still, the nurse placed Bryan on the list to be seen by a
provider. (*Id.*)

As of late June 2015, Bryan was housed at NWSCF to complete the Vermont
Treatment Program for Sexual Abusers. (Doc 103-1 at 6, ¶ 38; *id.* at 10, ¶ 70). On
July 9, 2015, Bryan saw the NWSCF Medical Provider, Dr. Susan Hetman. (Doc.
103-4 at 4.) Dr. Hetman's notes indicate that Bryan informed her that he had
perforated his left eardrum on October 14, 2014, with a homemade "Q-Tip," and that
he been doing well until approximately two weeks prior, when he "had [a] sudden
onset of pain and hearing loss in [his] left ear" and some clear yellow discharge. (*Id.*)
The notes further indicate that Bryan said that he had "[u]sed drops for several
days," but stopped because he could taste them in his mouth. (*Id.*) Finally,
Dr. Hetman's examination notes described "[y]ellow fluid . . . at level of tympanic
membrane[ and] . . . [p]erforated left eardrum with ser[i]ous drainage and absent
hearing." (*Id.*) Dr. Hetman prescribed Bryan antibiotics and submitted a request to
schedule an appointment with an Ear, Nose, and Throat (ENT) specialist as soon as
possible. (*Id.*) Bryan received a referral for a consult with an ENT that same day.
(Doc. 103-1 at 4, ¶ 18.)

Several months went by before the ENT specialist could see Bryan. (*Id.*) By
August 2015, Bryan had inquired about the ENT appointment repeatedly, as he
believed that medical personnel were not taking appropriate steps to treat his ear.

(Doc. 72 at 7, ¶ 16.)  As a result, he began the formal grievance process, which is described below.

On September 13, 2015, Bryan submitted another Healthcare Request, stating that he "was diagnosed with ruptured eardrum" and indicating that he was still awaiting an appointment with a specialist.  (Doc. 103-4 at 3; Doc. 103-3 at 3, ¶ 18.) In addition, Bryan again described fluid coming out of his ear, saying it "hurts badly."  (Doc. 103-4 at 3.)

Bryan saw Dr. Julien, the ENT specialist, on October 7, 2015.  (Doc. 103-3 at 3, ¶ 19.)  Dr. Julien suggested that Bryan use Cipro or Floxin ear drops for any continued discharged from his ear.  (*Id.*; Doc. 103-5 at 2–3.)  Dr. Julien further noted that Bryan should return for a follow-up visit in two months.  (Doc. 103-5 at 2–3.)

Bryan did not receive that follow-up visit.  (Doc. 72 at 8, ¶ 19.)  Instead, on December 20, 2015, he filled out a Healthcare Request to determine why he had not received the appointment with Dr. Julien.  (*Id.*)  According to his Amended Complaint, he was informed that the appointment was not made "due to unknown Medical personnel[] error" and that "the many month process to get a referral and to see an ENT would have to start over."  (*Id.*)

Then, on December 30, 2015, Bryan saw Defendant Dr. Fisher for a quarterly medical checkup.  (*Id.* ¶ 20; Doc. 77-22 at 1–4.)  Apparently, Bryan asked about his follow-up appointment with Dr. Julien.  According to Dr. Fisher's notes, he informed Bryan that he had not received records from Bryan's visit with Dr. Julien, and explained to Bryan that he would need to sign another records release before a

follow-up ENT appointment could be scheduled. (Doc. 72 at 8, ¶ 20; Doc. 77-22 at 1.) Dr. Fisher also noted that Bryan had refused the ear drops previously prescribed by Dr. Julien. (*Id*.)

Bryan saw Dr. Julien again in May 2016, at which time Dr. Julien noted that Bryan was a "candidate for a tympanoplasty." (Doc. 103-5 at 4.) Dr. Julien specified that the surgical procedure was not urgent, but the patient "wants it done." (*Id*.) Bryan's ear pain continued on and off over the next few months, and Dr. Julien continued to prescribe Cipro and Floxin drops for the chronic infections (Doc. 103-3 at 4, ¶ 21; Doc. 103-4 at 2, 30–31.)

On December 22, 2016, a registered nurse referred Bryan to Dr. Julien to determine whether his condition was stable or worsening and to provide a "recommendation for treatment/management." (Doc. 103-4 at 35.) As a result of this referral, Bryan saw Dr. Julien again in January 26, 2017, at which time Dr. Julien reported that "the perforation appears stable," and recommended that Bryan continue using ear drops and "[e]ventually, repair surgery could be offered on an elective basis." (Doc. 103-5 at 5.)

On March 17, 2017, another nurse practitioner referred Bryan to Dr. Julien for surgical repair of his perforated eardrum. (Doc. 103-4 at 32.) On April 20, 2017, Dr. Julien referred Bryan to a surgical doctor at Dartmouth Hitchcock Medical Center. (Doc. 103-5 at 6.) Prior to surgery, Bryan met with the doctor for a consult where they discussed the advantages and risks of undergoing the procedure. (Doc. 103-1 at 5, ¶ 30.) Bryan also underwent a hearing test on May 30, 2017 as a pre-

surgery requirement. (*Id.* ¶ 31; Doc. 103-4 at 36.) On August 14, 2017, the surgical

doctor performed the tympanoplasty on Bryan's left ear. (Doc. 103-1 at 5, ¶ 33.)

Bryan had a follow-up appointment with the surgical doctor on August 24, 2017, and

he is recovering from surgery without "infection or complications." (*Id.* ¶¶ 34–35; *see

also* Doc. 103-4 at 38–39.)

### C.    Grievance Process

#### 1.    DOC Procedures

The DOC grievance policy and procedure is stated in Department Directive

320.01. *See State of Vt. Agency of Human Servs., Dep't of Corr., Corr. Servs.:

Directive #320.01 Offender Grievance Sys. for Field & Facilities* (2007),

http://www.doc.state.vt.us/about/policies/pdu-general/rpd/ correctional-services-301–

550/301–335–facilities-general/320.01.pdf [hereinafter Directive 320.01].[2]

The grievance process begins with an inmate's informal verbal or written

complaint submitted within 10 business days after the event or discovery of the cause

of the complaint, unless the inmate's grievance is an emergency or involves serious

employee misconduct. Directive 320.01.7(a)(i); (Doc. 103-11 at 1, ¶ 3). DOC

employees attempt to resolve informal complaints by agreeing on a written solution

with the inmate. Directive 320.01.7(a)(iv), (v); (Doc. 103-11 at 1, ¶ 4). If a resolution

is not reached within 48 hours, the inmate may then proceed to the formal grievance

process. Directive 320.01.7(a)(vi); (Doc. 103-11 at 1, ¶ 4).

---

[2] The Court may take judicial notice of DOC procedures. *See Christman v. Skinner*, 468 F.2d
723, 726 (2d Cir. 1972) (finding it proper for the district court to take judicial notice of state prison
rules and regulations).

A formal grievance must be filed with DOC staff within 14 business days after the informal complaint process is exhausted. Directive 320.01.10(a)(i), (vi); (Doc. 103-11 at 1, ¶ 5.) Only one grievance may be filed at any one time on a single incident. Directive 320.01.10(a)(iii). If the grievance is about an acceptable issue, the grievance coordinator will investigate, review the findings with the superintendent, and recommend that the grievance be denied, sustained, or sustained as meritorious in part. *Id.* at 320.01.10(a)(ix)–(xi). The superintendent determines whether to uphold or alter the recommendation of the grievance coordinator. *Id.* at 320.01.10(a)(xii). The entire process must be completed within 20 days of the inmate's filing of the grievance. *Id.*

If the grievance involves a nonemergency health issue, the same informal complaint process described above applies. *Id.* at 320.01.11(a). The formal grievance process for health issues is largely the same as well, except that the inmate must write "HEALTH" at the top of the grievance form and verbally notify DOC staff of the written health grievance. *Id.* at 320.01.11(b)(i). To investigate a health grievance, a nurse manager is assigned and the grievance coordinator reviews the nurse manager's recommendations with the superintendent, who upholds or alters the recommendations. *Id.* at 320.01.11(b)(iv), (v).

Regardless of whether an inmate's formal grievance is general or health related, an inmate has 10 business days to mail an appeal of the superintendent's decision to the corrections executive. *Id.* 320.01.15(a)(i), (ii); (Doc. 103-11 at 1, ¶ 6.) Within 20 days, the corrections executive will inform the inmate in writing whether

the appeal is denied, sustained, or sustained as meritorious in part. Directive 320.01.15(a)(iv).

The corrections executive's decision may then be appealed to the commissioner within 10 business days. *Id.* at 320.01.15(b)(i); (Doc. 103-11 at 1, ¶ 7). The commissioner has 20 days to review the appeal and to inform the inmate in writing of the ultimate decision. *See* Directive 320.01.15(b)(i). Upon return of the commissioner's decision, the disposition is final and there are no further administrative appeals. *Id.* at 320.01.15(b)(iii). DOC maintains a database of grievances that are sent to the executive level and those that are further appealed to the commissioner. (Doc. 103-11 at 2, ¶ 9.)

### 2.    Bryan's Grievances

As noted above, on August 11, 2015, Bryan filed an Informal Complaint & Plan for Resolution with DOC staff regarding the treatment he had received for his left ear. (Doc. 72 at 7, ¶ 16; Doc. 4-1 at 1.) The resolution proposed by DOC staff was that an "ENT outside appt has been scheduled." (Doc. 4-1 at 1.) Bryan did not agree to the proposed resolution. (*Id.*)

Bryan filed a second grievance on or about January 16, 2016, "claiming neglect due to inadequate medical staff responses and/or treatment," which he says prolonged his eardrum infection and hearing loss. (Doc. 72 at 9, ¶ 21; *see also* Doc. 4-1 at 2.) To resolve the grievance, Bryan proposed that the resolution "should be for [him] to have ear repaired as [he] was promised by Dr. Julien." (Doc. 4-1 at 2.) The medical investigator recommended that the grievance be dismissed because Bryan

had a referral pending for evaluation by an ENT specialist.  (Doc. 4-1 at 4.)  The grievance coordinator did not accept this recommendation, instead concluding on February 16, 2016,[3] that Bryan's grievance was meritorious in part and noting that "Inmate has a pending appointment w/ specialist."  (Doc. 4-1 at 5.)

On February 9, 2016, prior to receiving the grievance response, Bryan appealed to the corrections executive, principally arguing that an ENT appointment had not actually been scheduled despite his allegedly ruptured eardrum.  (Doc. 4-1 at 6; Doc. 72 at 9, ¶ 22.)  Apparently, he did not receive a response to this appeal.  (Doc. 72 at 10, ¶ 25.)  On March 7, 2016,[4] he filed a "Decision Appeal to Commissioner" stating that he had never received a response for his prior appeal and that "due to medical neglect follow-up appt never was made per order from ENT on 10.8.15." (Doc. 4-1 at 7.)  There is no record of any response to Bryan's final appeal to the commissioner.  Nor is there a record of any other grievances filed by Bryan after March 7, 2016.  On June 22, 2016, Bryan filed his initial Complaint in this Court pursuant to 42 U.S.C. § 1983, which is described in detail below.  (Doc. 4.)

## II.    Participation in the Vermont Treatment Program for Sexual Abusers

As part of Bryan's incarceration, he must complete the Vermont Treatment Program for Sexual Abusers (VTPSA or the program).  (Doc. 103-1 at 7, ¶ 52; Doc. 103-9 at 1, ¶ 3.)  The VTPSA treats offenders, like Bryan, who have been

---

[3] This date was within 20 business days of Bryan's grievance filing, as required by Directive 320.01.10(a)(xii).

[4] Bryan dated his "Decision Appeal to Commissioner" (Doc. 4-1 at 7) March 7, *2015*.  However, as his appeal to the commissioner was his final grievance, and all of his prior grievances were dated after August 11, 2015, Bryan appears to have miswritten the date on this document.

convicted of sexual offenses or whose police affidavits contain information that meets the criteria of a sexual offense. (Doc. 103-9 at 1, ¶ 2.) NWSCF is the DOC facility that offers the program for most inmates. (*Id.*) If an inmate has been terminated or removed from the VTPSA and has been waiting more than a month to be readmitted into the program, it is DOC's standard practice to transfer that inmate out of NWSCF. (Doc. 103-2 at 2, ¶ 8.)

On June 4, 2015, Bryan was transferred to NWSCF, apparently to begin participation in the VTPSA. (Doc. 103-1 at 6, ¶ 38; Doc. 103-9 at 1, ¶¶ 2–3.) This time period coincided with the apparent deterioration in Bryan's ear condition and Dr. Hetman's recommendation that he see an ENT specialist. (Doc. 72 at 6, ¶¶ 14–15; Doc. 103-1 at 3, ¶ 15.) It also coincided with Bryan's first informal grievance, which he filed on August 11, 2015. (Doc. 72 at 7, ¶ 16; Doc. 4-1 at 1.) Two days later, on August 13, Bryan was given written notice and placed on a 30-day probation period from the VTPSA because of the following: he referred to a fellow group member as a "brown-noser"; called the group facilitator a "slacker"; and, after the group session, disagreed with the group facilitator and then refused to leave the hallway when he was denied permission to bring his caseworker and an interventionist into the discussion. (Doc. 103-9 at 1–2, ¶ 5.)

On September 10, 2015, while still on his 30-day probation, Bryan was terminated from the VTPSA based on two events. (*Id.* at 2, ¶ 6.) The first event occurred on August 21, 2015, when Bryan was directed to meet with a correctional services specialist and the VTPSA's risk reduction coordinator to review reflective

assignments he received as part of his VTPSA probation.  (*Id*. ¶ 6(b).)  During this

meeting, Bryan became defensive and agitated; he raised his hands and his voice to

the point that staff who overheard the meeting entered the office to provide support.

(*Id*.)  The second event occurred on September 4, 2015, when Bryan became

argumentative and hollered at a corrections officer after being directed to shower.

(*Id*. ¶ 6(a).)  When he returned to his cell, Bryan slammed his cell door with such

force that he broke a window.  (*Id*.)  Based on this second incident, Bryan was

convicted of a major disciplinary rule violation[5] and he was segregated in a

Restrictive Housing Unit (RHU) at NWSCF from September 4 to September 8, 2015.

(Doc. 103-1 at 6, ¶ 40.)  Further, after the August 21 and September 4 events, Bryan

was given written notice that he had been terminated from the VTPSA for

six months.  (Doc. 103-8.)  Per DOC policy, Bryan was transferred from NWSCF on

September 11, 2015[6] and housed at NSCF during his six-month termination from the

VTPSA.  (Doc. 103-1 at 7, ¶ 45; *see also* Doc 103-8 at 2).

    While at NSCF and during his six-month termination from the VTPSA, Bryan

saw Dr. Julien for the first time on October 7, 2015.  (Doc. 103-3 at 3, ¶ 19.)

Similarly, during these six months at NSCF, Bryan completed the administrative

grievance process for his ear injury and filed this § 1983 action on June 22, 2016.

(Doc. 4.)

---

[5] This disciplinary rule violation was a Major B #21 violation, which is "conduct that disrupts the orderly running of the facility."  (Doc. 103-2 at 1, ¶ 4.)

[6] According to Bryan, his transfer from NWSCF to NSCF violated a medical hold that NWSCF placed on him while he was awaiting his ENT appointment, but he does not offer any evidence of this assertion.  (Doc. 72 at 3, ¶ 6.)

Bryan was transferred back to NWSCF on July 5, 2016, to continue the VTPSA. (Doc. 103-1 at 6, ¶ 38.) But on August 25, 2016, Bryan was again terminated from the program based on his continual aggressive behavior. Specifically, although Bryan's behavior toward male authority figures was appropriate, his interactions with female staff were "aggressive and accusatory[,] and he was typically asked to leave when attempts to redirect were unsuccessful." (Doc. 103-9 at 3, ¶ 7(a).) For example, on August 18, 2016, Bryan asked staff members about "doubling up" groups to finish the VTPSA early and be released. (*Id.* ¶ 7(b).) When staff reiterated that Bryan's required time in the program was 21 months, he became angry and accused a staff member of being a liar. (*Id.*) The next day, staff members met with Bryan and gave Bryan an assignment to reflect on his behavior. (*Id.* ¶ 7(c).) Bryan then "became defensive and agitated[,] evidenced by [his conduct, which included] raising his voice, leaning toward staff, and waving his hands . . . that appeared to be an attempt to intimidate staff." (*Id.*) As a result of this aggressive behavior toward DOC staff, he was found guilty of another major disciplinary rule violation[7] and confined to a RHU from August 19 to August 26, 2015. (Doc. 103-2 at 1–2, ¶¶ 4–5.) Moreover, Bryan was again terminated from the VTPSA for six months and, on August 26, 2016, he was transferred back to NSCF. (Doc. 103-1 at 6, ¶ 38; Doc. 103-9 at 2, ¶ 8.)

Although Bryan was eligible to resume participation in the VTPSA and return to NWSCF on February 26, 2017, he continued to exhibit uncooperative and agitated

---

[7] This was a Major A #06 violation, which is "creating a disturbance that threatens the order and safety of the facility." (Doc 103-2 at 1, ¶ 4.)

behavior on a phone call with the director of the VTPSA and thus did not reenter the program at that time.  (Doc. 103-9 at 2, ¶ 9.)  Bryan was more positive and proactive in a second phone call on March 16, 2017, and the VTPSA director determined he would be transferred back to NWSCF sometime between that date and the first week of April 2017 to resume the VTPSA.  (*Id*. at 3, ¶ 10.)  Because of a medical hold for his scheduled ear surgery, however, Bryan was not transferred to NWSCF by April 2017.  (*Id*. ¶ 11.)  The VTPSA staff told Bryan that he would return to the VTPSA as soon as he was cleared medically.  (*Id*.)  Doc. 103-1 at 11, ¶ 73.)  Bryan is not currently at NWSCF nor has he resumed the program.  (Doc. 103-9 at 3, ¶ 11; Doc. 72 at 13, ¶ 34.)

### III.    Pending Motion for Summary Judgment

As noted above, on June 22, 2016, Bryan filed his initial Complaint pursuant to 42 U.S.C. § 1983.  (Doc. 4.)  In the Compliant, he claimed that he was denied proper medical treatment for his "ruptured ear drum" and requested that this Court order proper medical care as well as monetary damages for medical costs and pain, suffering, and mental anguish.  (Doc. 4 at 3, 7.)

After given leave by this Court, (Doc. 13), Bryan filed an Amended Complaint on October 27, 2016.  (Doc. 20.)  In his Amended Complaint, Bryan brought suit against Defendants in their "official capacity" under 42 U.S.C. § 1983, contending that Defendants, by failing to care for his "ruptured ear drum" committed "deliberate indifference with medical neglect" that violated his Eighth Amendment rights.  (*Id*. at 3.)  He asked for declaratory and injunctive relief as well as monetary damages.

16

(*Id.* at 4–5.)  Subsequently, following a motion by Defendants' for judgment on the

pleadings,[8] Bryan sought leave to amend his complaint for a second time in order to

bring claims against Defendants in their "individual capacity."  (Doc. 64.)  Over

opposition by Defendants, (Doc. 61), this Court granted Bryan's motion to amend.

(Doc. 68.)

Bryan filed his Second Amended Complaint on April 17, 2017.  (Doc. 72.)  In

this Complaint, Bryan names, in their individual capacities: Lisa Menard, DOC

commissioner; Shannon Marcoux, superintendent of Northern State Correctional

Facility (NSCF); Greg Hale, superintendent of Northwest State Correctional Facility

(NWSCF); and Dr. Steven Fisher, the Centurion regional medical director.[9]  (*Id.* at 2–

4.)  Bryan contends that Defendants violated his rights under 42 U.S.C. § 1983 in

three respects: (1) Menard, Marcoux, and Hale demonstrated deliberate indifference

to Bryan's health by neglecting to enforce Bryan's right to proper medical care for his

ruptured eardrum, (*id.* at 11–12, ¶¶ 28–31); (2) Dr. Fisher exercised deliberate

indifference to Bryan's health by failing to provide adequate medical care for Bryan's

eardrum and by failing to refer Bryan for follow-up care with an ENT, (*id.* at 12–13,

---

[8] Defendants' Motion for Judgment on the Pleadings argued that they were not "persons" subject to suit under § 1983 and that, even if they were persons, Bryan did not allege that the defendants were personally involved in the alleged constitutional violation.  (Doc. 52 at 4, 5.)  This Court later concluded that the Defendant's Motion for Judgment on the Pleadings was moot in light of Bryan's Second Amended Complaint.  (Doc. 76.)

[9] As noted above, the Second Amended Complaint also named the regional medical director of Correct Care Solutions and Correct Care.  (Doc. 72.)  But the director and Correct Care moved separately for summary judgment on April 21, 2017 and this Court issued a report and recommendation concluding that the motion for summary judgment should be granted and the claims against the director and Correct Care be dismisMesed with prejudice.  (Doc. 90); *see also Bryan v. Menard*, Civil Action No. 5:16-cv-157-gwc-jmc, 2017 WL 2964008, at *1 (D. Vt. June 19, 2017), *report and recommendation adopted*, 2017 WL 2964807 (D. Vt. July 10, 2017).

17

¶¶ 32–33); and (3), after Bryan began filing DOC grievances and the present § 1983 action, Hale retaliated by improperly segregating Bryan in a RHU and removing Bryan from the program.[10]  (*Id.* at 13, ¶¶ 34–35.)  Bryan further alleges that he exhausted all administrative remedies in pursing these claims.  (*Id.* at 7–11.)

On September 1, 2017, Defendants filed the present Motion for Summary Judgment under Fed. R. Civ. P. 56.  (Doc. 103.)  Defendants argue that Bryan's first two claims must be dismissed because Bryan cannot show that Defendants failed to provide him with adequate medical care, as required by the Eighth Amendment.  (*Id.* at 9–11.)  Defendants also contend that Bryan's third claim should be dismissed because he did not exhaust all available administrative remedies as required by the PLRA and that, because Bryan does not allege that Menard and Marcoux were personally involved in the retaliation, the retaliation claim against them must be dismissed.  (*Id.* at 13–15.)  Finally, Defendants assert that there is no question that Defendants did not retaliate against Bryan and, as result, Bryan's third claim cannot survive summary judgment.  (*Id.* at 15–18.)

In his response, Bryan admits to a majority of the facts set forth by Defendants in their Statement of Undisputed Material Facts.  (*See generally* Doc. 104-1; *see also* Doc. 103-1.)  Even so, Bryan opposes summary judgment, arguing that Defendants were clearly indifferent to his medical needs and that the allegedly

---

[10]  Although Bryan does not cite to specific constitutional provisions that Defendants violated, this Court construes Bryan's first two claims as alleging that Defendants deprived him of his Eighth Amendment right to adequate medical care, *see Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006), and interprets Bryan's third claim as contending that Defendants violated his rights under the First Amendment and Fourteenth Amendment to file a grievance or to bring suit in federal court. *Franco v. Kelly*, 854 F.2d 584, 589 (2d Cir. 1988).

ruptured eardrum was a sufficiently serious harm under the Eighth Amendment. (Doc. 104 at 9–10.)  He also claims that he exhausted his administrative remedies, pointing to the numerous grievances he filed with DOC complaining of his ear injury. (*Id.* at 12–13.)  Finally, Bryan contends that the claims against Menard and Marcoux must be sustained because "these persons are supposed to ensure inmates medical needs are fully met." (*Id.* at 13.)  In reply, Defendants reiterate the arguments in their Motion for Summary Judgment and also claim that Bryan's admissions to the facts effectively establishes that no material fact is in dispute. (*See generally* Doc. 105.)

**Discussion**

## I.    Standing

Although neither party raises this issue, this Court must first consider whether Bryan has standing to bring his claims, particularly his requests for equitable relief.  To establish standing in federal court, "a plaintiff must demonstrate that (1) he or she has suffered an injury; (2) the injury is traceable to the defendants' conduct; and (3) a federal court decision is likely to redress the injury." *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 344 (2d Cir. 1998).  "A plaintiff seeking injunctive or declaratory relief cannot rely on past injury to satisfy the injury requirement but must show a likelihood that he or she will be injured in the future." *Id.* (citing *City of Los Angeles v. Lyons*, 461 U.S. 95, 105–06 (1983)); *see also O'Shea v. Littleton*, 414 U.S. 488, 495–96 (1974) ("Past exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief, however, if

19

unaccompanied by any continuing, present adverse effects."). This "likelihood of future harm" must be "real and immediate," though it need not be certain. *Shain v. Ellison*, 356 F.3d 211, 215–16 (2d Cir. 2004). Plaintiffs bear the burden of alleging facts in their complaint sufficient to establish standing. *Amnesty Int'l USA v. Clapper*, 667 F.3d 163, 176–77 (2d Cir. 2011).

Bryan's Eighth Amendment claim stems from Defendants' alleged failure to adequately treat his ear injury. In the course of this § 1983 action, however, Bryan's eardrum was surgically repaired and he is currently recovering from surgery with several follow-up appointments scheduled. (Doc. 103-3 at 5, ¶¶ 29–32.) Bryan does not set forth any allegations, let alone plausible ones, that he is experiencing ongoing adverse effects after his ear surgery or that he is likely to suffer real future harm based on Defendants' alleged failure to provide medical treatment. (*See generally* Doc. 72.); *see Shain*, 356 F.3d at 215–16; *Marcavage v. City of New York*, 689 F.3d 98, 103 (2d Cir. 2012) ("To obtain *prospective* relief, such as a declaratory judgment or an injunction, a plaintiff must show, *inter alia*, a sufficient likelihood that he [or she] will again be wronged in a similar way." (internal quotation marks omitted)). Thus, although Bryan's claims of past ear damage may provide a basis for seeking monetary damages, they do not confer standing to seek injunctive and declaratory relief. *Carter v. CIOX Health*, LLC, 260 F. Supp. 3d 277, 287 (W.D.N.Y. 2017); *Deshawn E. by Charlotte E.*, 156 F.3d at 344.

Similarly, Bryan does not advance any facts sufficient to support constitutional standing to seek declaratory and injunctive relief based on Defendants'

alleged retaliation.  Bryan's retaliation claim is grounded in his removal from the

VTPSA and his segregation in a RHU for disciplinary rule violations.  (Doc. 72 at 13,

¶¶ 34–35.)  Bryan is currently not in the VTPSA or in segregation, but he alleges

that he is "still being punished" as a result of the grievances he filed and the present

§ 1983 claim.  (*Id.* ¶ 34.)  Aside from this conclusory assertion, however, Bryan

provides no factual support to plausibly demonstrate that, in the future, Defendants

are likely to unlawfully bar his participation in the VTPSA and place him in a RHU

in retaliation for exercising his constitutional rights.  *Marcavage*, 689 F.3d at 103;

*Ward v. LeClaire*, No. 9:07–CV–0026 (LEK/RFT), 2007 WL 1532067, at *2 (N.D.N.Y.

May 24, 2007) ("Plaintiff's request for injunctive relief against future threats or

harassment by inmates and/or prison officials is too speculative to meet the

irreparable harm requirement. Although Plaintiff claims that he will face future

threats and harassment, Plaintiff cannot claim with any certainty how, when, or

where he will be retaliated against, or that the retaliation will result in irreparable

harm to Plaintiff." (citation omitted)).  Likewise, although Bryan claims that

Defendants' alleged retaliatory behavior was part of a "pattern of events

demonstrating intentional retaliation," (Doc. 72 at 13, ¶ 35), he provides no factual

support for this claim nor does he demonstrate that he is likely to be subject to that

pattern in the future.  *Carter*, 260 F. Supp. 3d at 288 ("[I]n addition to alleging that

the challenged conduct is part of a practice or policy, Plaintiffs must allege that they

are likely to have another encounter with that practice or policy.").  For example,

Bryan does not allege that he will continue to file grievances.  *Cf. id.* ("That plaintiffs

have requested records multiple times in the past, . . . and thus could conceivably request records again in the future, is not enough."). As a result, Bryan's retaliation claims may allow him to pursue monetary damages, but he has no standing to seek injunctive and declaratory relief based on those claims. *Id.* at 287; *Deshawn E. by Charlotte E.*, 156 F.3d at 344.

Accordingly, to the extent that Bryan seeks injunctive and declaratory relief, he has not alleged sufficient facts to confer standing;[11] therefore, I recommend that the Court dismiss Bryan's claims for injunctive and declaratory relief without prejudice. *See Hernandez v. Conriv Realty Assocs.*, 182 F.3d 121, 123 (2d Cir. 1999) ("[W]here a court lacks subject[-]matter jurisdiction, it also lacks the power to dismiss with prejudice.").

## II.    Legal Standards

### A.    Summary Judgment

A motion for summary judgment should be granted when the record shows "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "genuine material dispute" is one where the disputed factual issues could reasonably be resolved in favor of either party and those issues concern facts that materially affect the outcome. *McPherson v. Coombe*, 174 F.3d 276, 280 (2d Cir. 1999). In other words, "[t]he moving party is entitled to summary judgment where 'the plaintiff has failed to come forth with

---

[11] Bryan lacks standing to bring his equitable claims against Defendant Greg Hale for an additional reason. Bryan is not being held at NWSCF, where Hale is the superintendent, and the Second Circuit has long held that "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin*, 467 F.3d at 272.

evidence sufficient to permit a reasonable juror to return a verdict in his or her favor'
on an essential element of a claim on which the plaintiff bears the burden of proof."
*Jean-Laurent v. Wilkerson*, 461 F. App'x 18, 22 (2d Cir. 2012) (quoting *In re Omnicom
Grp., Inc., Sec. Litig.*, 597 F.3d 501, 509 (2d Cir. 2010)).

In considering a motion for summary judgment, any ambiguity or doubt as to
the existence of a genuine issue of material fact must be resolved in favor of the
nonmoving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). In making its
determination, the Court accepts as true the nonmoving party's allegations that are
supported by admissible evidence, and also gives the nonmoving party the benefit of
all reasonable doubts and inferences. *Harlen Assocs. v. Inc. Vill. of Mineola*, 273 F.3d
494, 498 (2d Cir. 2001). If the moving party demonstrates that there are no genuine
issues of material fact, then the burden shifts to the nonmoving party, who must
present "'significantly probative supporting evidence' of a disputed fact." *Hamlett v.
Srivastava*, 496 F. Supp. 2d 325, 328 (S.D.N.Y. 2007) (quoting *Anderson v. Liberty
Lobby, Inc.*, 477 U.S. 242, 249 (1986)). That is, the nonmoving party "must come
forward with materials setting forth specific facts showing that there is a genuine
issue of material fact; he [or she] cannot defeat summary judgment by relying on the
allegations in his [or her] complaint, conclusory statements, or mere assertions that
affidavits supporting the motion are not credible." *Hamlett*, 496 F. Supp. 2d at 328;
*see also Harlen Assocs.*, 273 F.3d at 499. If no genuine issue of material fact exists,
and the nonmoving party has had adequate opportunity to address the issues

23

involved by developing facts necessary to oppose summary judgment, summary judgment is proper.  Fed. R. Civ. P. 56(e).

Because Bryan is proceeding *pro se*, the Court must read his pleadings liberally and interpret them "to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir.1994).  Still, Bryan's *pro se* status does not exempt him from the summary judgment requirements; he cannot rely on "bald assertions," he must support his arguments with admissible evidence to overcome Defendants' summary judgment motion.  *Crenshaw v. Herbert*, 445 F. Supp. 2d 301, 303 (W.D.N.Y. 2006) (quoting *Hernandez v. McGinnis*, 272 F. Supp. 2d 223, 226 (W.D.N.Y. 2003)); *see also Conroy v. N.Y. State Dep't of Corr. Servs.*, 333 F.3d 88, 94 (2d Cir. 2003) ("[M]ere conclusory allegations, speculation[,] or conjecture will not avail a party resisting summary judgment." (first alteration in original) (quoting *Cifarelli v. Village of Babylon*, 93 F.3d 47, 51 (2d Cir. 1996))).

## B.     42 U.S.C. § 1983

Under 42 U.S.C. § 1983, a plaintiff may bring suit "against '[e]very person who, under color of any statute . . . of any State . . . subjects, or causes to be subjected, any citizen . . . to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws . . . .'" *Wyatt v. Cole*, 504 U.S. 158, 161 (1992) (alterations in original) (quoting 42 U.S.C. § 1983).  The Supreme Court has identified two elements of a § 1983 claim: "a plaintiff must allege [(1)]the violation of a right secured by the Constitution and laws of the United States, and [(2)] must

show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins*, 487 U.S. 42, 48 (1988).

In this case, as noted above, Bryan raises two constitutional violations: he argues that Defendants deprived him of his Eighth Amendment right to adequate medical care, *see Salahuddin*, 467 F.3d at 279; and, he contends that Defendants violated his rights under the First Amendment and Fourteenth Amendment to file a DOC grievance and to bring suit in federal court. *Franco*, 854 F.2d at 589. As discussed in more detail below, Bryan fails to support his allegations with sufficient admissible evidence to survive Defendants' summary judgment motion.

## III.    Eighth Amendment Claims

Bryan's first § 1983 claim must be dismissed because there is no genuine dispute of material fact to support Plaintiff's claim that Defendants violated his rights under the Eighth Amendment, and the alleged deficiencies in his medical care do not rise to the level of a constitutional violation. With respect to Defendants Menard, Marcoux, and Hale, moreover, it is undisputed that they had no personal involvement in the alleged deprivation of Bryan's Eighth Amendment rights.

### A.    Violation of Constitutional Right

A prisoner advancing a § 1983 claim must first establish "the violation of a right secured by the Constitution and laws of the United States." *Atkins*, 487 U.S. at 48. Such a right is recognized by the Cruel and Unusual Punishments Clause of the Eighth Amendment, which imposes a duty on prison officials to provide adequate medical care to prisoners. *Salahuddin*, 467 F.3d at 279. Under the test established

by the Supreme Court in *Estelle v. Gamble*, to show that a prison official has violated this duty, the prisoner must demonstrate "deliberate indifference to [the prisoner's] serious medical needs." 429 U.S. 97, 104 (1976). This test has objective and subjective components, which are addressed in turn below. *Hill v. Curcione*, 657 F.3d 116, 122 (2d Cir. 2011).

### 1.     Objective Prong

Under the objective prong, the prisoner must show an actual deprivation of adequate medical care that was "sufficiently serious." *Salahuddin*, 467 F.3d at 280. Determining whether a deprivation reaches this threshold involves two inquiries "tailored to the specific circumstances of each case." *Smith v. Carpenter*, 316 F.3d 178, 185 (2d Cir. 2003). The Court must determine "whether the prisoner was actually deprived of adequate medical care" and "whether the inadequacy in medical care is sufficiently serious." *Salahuddin*, 467 F.3d at 279, 280. Several factors are relevant to the seriousness of the medical condition: whether a reasonable doctor or patient would comment on the condition; whether the prisoner's daily activities are affected by the condition; and, whether the condition causes chronic and substantial pain. *Id.* at 280. If the prisoner complains of a delay or interruption in treatment, the seriousness inquiry "focuses on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone." *Id.* (alteration and internal quotation marks omitted). "[O]nly those deprivations denying the minimal civilized measure of life's necessities[] are sufficiently grave to form the basis of an

Eighth Amendment violation." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991) (internal quotation marks and citation omitted).

Bryan fails to establish a genuine dispute that his ear injury was a sufficiently serious medical need. Although he complains of pain in his ear prior to surgery and he asserts that his hearing has been permanently damaged, he provides no factual support for these conclusory statements, nor does he offer specific evidence that his ear injury significantly affected his daily activities and quality of life during the period prior to surgery. *Cf. Chavis v. vonHagn*, No. 02-CV-0119(SR), 2009 WL 236060, at *44 (W.D.N.Y. Jan. 30, 2009) (concluding plaintiff's ear infection not objectively serious where plaintiff failed to "offer any specificity with respect to the 'extreme pain' that he claims he suffered" and the record was "utterly devoid of any mention by plaintiff of any impact on his daily activities, or the severity or persistence of pain"); *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (concluding inmate's need for dental work was serious where inmate alleged that he was unable to eat properly); *see also Harlen Assocs.*, 273 F.3d at 499 (nonmoving party must offer more than "mere speculation and conjecture"). In contrast to Bryan's conclusory assertions, the record shows that the ENT specialist, Dr. Julien, did not believe a tympanoplasty procedure was an urgent need, that Dr. Julien attempted to treat the ear injury using drops, and that Bryan's ear injury sometimes responded well to these treatments. (*See* Doc. 103-5.); *cf. Dotson v. Fischer*, 613 F. App'x 35, 38 (2d Cir. 2015) (concluding nurse's urgent recommendation to remove cyst in inmate's left ear was sufficiently serious when accompanied "vertigo, blinding

headaches, extreme pain in his left ear, and increased hearing loss" (internal

quotation marks omitted)).  Taken together, the facts do not raise a genuine question

that Bryan's injury deprived him of "the minimal civilized measure of life's

necessities." *Wilson*, 501 U.S. at 298 (internal quotation marks omitted); *see also*

*Chance*, 143 F.3d at 702  ("The standard for Eighth Amendment violations

contemplates a condition of urgency that may result in degeneration or extreme

pain." (internal quotation marks omitted)).

Even assuming arguendo that Bryan's ear injury was a sufficiently serious

medical need, ample evidence demonstrates that he was not deprived of adequate

medical care for that injury.  Bryan was seen by medical personnel within a day or

two of each healthcare request; each time, he was diagnosed and provided treatment

by a nurse or registered nurse; and, eventually, he was referred to Dr. Julien, who

saw Bryan for multiple follow-up appointments.  (*See generally* Doc. 103-4 at 7–26;

Doc. 103-1 at 2, ¶ 8.)  Between the follow-ups, Bryan was seen by nurses and the

prison's medical provider and given ear drops to manage his recurring ear infection.

(Doc. 72 at 8, ¶ 20; Doc. 103-4 at 35.)  In short, Bryan was never denied treatment for

his ear condition, nor did medical personnel ignore his health requests.  *Cf.*

*Summerville v. Faciuna*, No. 05-CV-6459 (CJS), 2009 WL 2426021, at *7 (W.D.N.Y.

Aug. 6, 2009) (concluding inmate received adequate treatment for ear problem when

nurses responded to inmate's requests and referred inmate to specialists).

Instead, the crux of Bryan's inadequate-care claim is that the delay between

his follow-up appointments with Dr. Julien and the year-long deferral of his elective

ear surgery constituted a serious injury. (Doc. 72 at 11–12, ¶¶ 28–32.) Although a delay in addressing a life-threatening or fast-degenerating injury may establish a serious medical condition, *Summerville*, 2009 WL 2426021, at *7, this is not such a case.

Here, after several months of recurring ear treatment, Bryan had an intensive bout of ear pain sometime between April and June 2015, which was accompanied by a new issue, fluid discharge. (Doc. 72 at 6, ¶ 14.) This incident appears to be recorded in the Healthcare Request submitted by Bryan on June 23, 2015. (Doc. 103-4 at 5.) The next day, on June 24, Bryan saw a nurse, who placed Bryan on the provider list. (*Id.*) On July 9, 2015, Bryan saw the provider, who prescribed antibiotics and scheduled an appointment with an ENT specialist as soon as possible. (*Id.* at 4.) Three months passed before the ENT specialist, Dr. Julien, saw Bryan on October 7, 2015. (Doc. 103-3 at 3, ¶ 19.) Dr. Julien prescribed ear drops for any continued ear discharge and scheduled a follow-up visit in two months. (*Id.*; Doc. 103-5 at 2.) From that point on, Dr. Julien provided care and follow-up appointments. *(See generally* Doc. 103-5.) Although these follow-up appointments did not occur regularly, it is clear that Dr. Julien continued to prescribe medication to manage Bryan's infections and that he concluded that the medication had stabilized Bryan's ear injury. (Doc. 103-3 at 4, ¶ 21; Doc. 103-4 at 30–31.) Moreover, despite Dr. Julien's conclusion that the injury had stabilized, he agreed with Bryan's request for elective surgery and referred Bryan for surgery. (Doc. 103-5 at 6.) After Bryan had the elective ear surgery, he recovered well, apparently without any permanent

damage. (Doc. 103-1 at 5, ¶¶ 34–35; *see also* Doc. 103-4 at 38.); *cf. Chance*, 143 F.3d at 702 (untreated dental problems that resulted in chronic pain for a period of six months resulting in tooth degeneration); *Koehl v. Dalsheim*, 85 F.3d 86, 87–88 (2d Cir.1996) (confiscation of prescription eyeglasses necessary to correct serious vision problem and subsequent denial of medical treatment resulting in loss of vision in one eye). Without question, these facts do not demonstrate an unreasonable delay in treating Bryan's injury, nor do they establish that any delay resulted in "further significant injury or the unnecessary and wanton infliction of pain." *Harrison v. Barkley*, 219 F.3d 132, 136 (2d Cir. 2000) (internal quotation marks omitted).

Moreover, Bryan's unfounded allegations do not call these facts into question. By comparison, in *Brock v. Wright*, a prisoner developed significant keloids (or fibrous tissue formations) over a scar on his face; according to a doctor's affidavit, the keloids caused constant and burning pain and prevented the prisoner from smiling, yawning, brushing his teeth, and chewing his food. 315 F.3d 158, 161 (2d Cir. 2003). The inmate requested a referral to a dermatologist, but he was denied any treatment. (*Id.*) The Second Circuit concluded that the inmate's allegations and accompanying affidavit precluded summary judgment for the defendants, because the defendants pointed to "no medical evidence" that cast doubt on the doctor's affidavit or the seriousness of the inmate's injury. *Id.* at 163. In this case, the weight of evidentiary support is completely reversed: Defendants provide significant evidence that Bryan received adequate and timely care in relation to the seriousness of his injury.

Given the weight of Defendants' evidence, the conclusory statements made by Bryan are too insubstantial to raise a material issue concerning the seriousness of his medical condition or to permit a finding that Bryan was deprived of appropriate medical care. *See Crenshaw*, 445 F. Supp. 2d at 303.

### 2.    Subjective Prong

Moreover, there is no material dispute as to Defendants' culpability because Bryan presents no evidence to support a finding that Defendants were deliberately indifferent to his injury.

Under the subjective prong of the *Estelle* test, a prison official must exhibit deliberate indifference to the prisoner's health or safety to violate the prisoner's constitutional rights. *Farmer v. Brennan*, 511 U.S. 825, 834 (citing *Wilson*, 501 U.S. at 302–03). Deliberate indifference requires more than negligence, but less than conduct undertaken for the very purpose of causing harm; it is the equivalent of acting recklessly. *Id*. at 826. Neither "negligen[ce] in diagnosing or treating a medical condition," *Estelle*, 429 U.S. at 106, nor the inmate's "mere disagreement over the proper treatment," *Chance*, 143 F.3d at 703, give rise to an Eighth Amendment claim. *See also Nails v. Laplante*, 596 F. Supp. 2d 475, 480 (D. Conn. 2009) ("Inmates do not have a constitutional right to the treatment of their choice.").

To demonstrate the requisite culpability, "proof of awareness of a substantial risk of the harm suffices." *Salahuddin*, 467 F.3d at 280. As with other questions of fact, this showing may be made using direct evidence, circumstantial evidence, or "a factfinder may conclude that a prison official knew of a substantial risk from the very

31

5:16-cv-00157-gwc-jmc    Document 107    Filed 01/25/18    Page 32 of 48

fact that the risk was obvious." *Farmer*, 511 U.S. at 842. If the evidence does not show that a prison official had knowledge of a risk to a prisoner or the facts establishing such a risk, the official cannot be found culpable. *Id.; see also id.* at 837 ("[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference."). Moreover, even if an official "actually knew of a substantial risk to inmate health or safety" that official "may be found free from liability if they responded reasonably to the risk, even if the harm ultimately was not averted." *Id.* at 844.

Here, Bryan adduces no evidence that Defendants were deliberately indifferent to a risk of serious harm. Three Defendants—Marcoux, Hale, and Menard—are supervisors in the DOC system and Bryan relies on his DOC grievances to allege that Marcoux, Hale, and Menard knew of his ear injury and Bryan's requests for an ENT follow-up. (Doc. 72 at 11–12, ¶¶ 28–31; *see generally* Doc. 4-1.). But the grievance forms filed by Bryan do not contain facts suggesting an obvious risk of serious injury; instead, the grievances indicate that a prison official investigated Bryan's complaint and recommended denying the grievance because Bryan had a "referral pending for eval/treatment by ear, nose, throat specialist." (Doc. 4-1 at 4.) At most, the records establish that Bryan was having trouble scheduling a follow-up appointment with an ENT specialist, but that medical officers were attempting to address Bryan's complaints. Further, the DOC supervisors were entitled to rely on the "sound medical judgment" of the medical officials in addressing Bryan's injury. *Chance*, 143 F.3d at 704. Therefore, the DOC supervisors did not

32

have a deliberate or reckless disregard for Bryan's health, nor does the evidence suggest that they had a subjective awareness that a substantial risk of serious harm existed. *Farmer*, 511 U.S. at 837.

Unlike the supervisors, Dr. Fisher plainly knew of Bryan's ear injury and Bryan's multiple requests for follow-up treatment. (*See generally* Doc. 77-22; Doc. 103-3.) But the record is also clear that Dr. Fisher and his medical staff took reasonable steps to address any risks associated with Bryan's injury. *Farmer*, 511 U.S. at 844. Dr. Fisher's affidavit exhaustively details all of Bryan's healthcare requests and the immediate follow-up appointments that Bryan received. (*See* 103-3 at 2–4, ¶¶ 6–13.) Dr. Fisher also describes the apparent deterioration of Bryan's ear injury in the summer of 2015 and the resulting appointment with the ENT specialist, Dr. Julien. (*See id.* at 3–4, ¶¶ 14–19.) Further, Dr. Fisher notes that, at his quarterly appointment with Bryan, he told Bryan that he had not received records from Bryan's visit with Dr. Julien, and that Bryan would need to sign another Release of Information form before a follow-up ENT appointment could be scheduled. (Doc. 72 at 8, ¶ 20; Doc. 77-22 at 1.) That follow-up eventually occurred in May 2016, and Dr. Fisher states that he was informed that Bryan was a candidate for ear surgery, but that the procedure was not urgent. (Doc. 103-3 at 4, ¶ 20.) Then, Dr. Fisher's affidavit details the treatment that Bryan received proceeding surgery, generally noting that Bryan's ear pain "intermittently persisted" and that he was prescribed ear drops for chronic ear infections. (*Id.* ¶ 21.) Finally, after almost a year of treatment, Dr. Fisher states that Bryan had surgery and that he is "currently

recovering from that surgery."  (*Id.* at 5, ¶ 30.)  In sum, the record demonstrates extensive treatment for Bryan's ear injury and Dr. Fisher's reasonable medical judgment, based on Dr. Julien's diagnostic assessment, that immediate surgery was not necessary.  "Such a medical judgment, even if unsound, [does] not constitute deliberate indifference."  *Hardy v. City of New York*, 732 F. Supp. 2d 112, 137 (E.D.N.Y. 2010); *see also Fox v. Fischer*, 242 F. App'x 759, 760 (2d Cir. 2007) ("[Defendants] were not deliberately indifferent to [the inmate's] medical problems, given that he received substantial medical treatment for his ear and sinus problems while [in prison], including treatment by a specialist, x-rays, and two courses of antibiotics.").

Although Bryan plainly disagrees with the trajectory of this treatment, "mere disagreement over the proper treatment" is not "deliberate indifference."  *Chance*, 143 F.3d at 703*; Sonds v. St. Barnabas Hosp. Corr. Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("[D]isagreements over medications, diagnostic techniques . . . , forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim.").  More significant for the purposes of summary judgment, aside from the conclusory allegations in Bryan's pleadings, Bryan fails to counter Defendants' substantial evidence with admissible evidence showing Defendants' deliberate indifference.  *See Hardy*, 732 F. Supp. 2d at 130 ("Given this dearth of evidence and the continual treatment that the record indicates that [the inmate] received, no reasonable jury could conclude that deliberate indifference was present.); *see also Anderson*, 477 U.S. at 247–48 ("[T]he

mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." (emphases omitted)); *Hamlett*, 496 F. Supp. 2d at 328.

In short, Bryan cannot establish a genuine material factual dispute concerning Defendants' deliberate indifference to a serious medical need and, as a result, summary judgment in favor of Defendants on Bryan's Eighth Amendment claims is warranted.

### B.    Personal Involvement of Menard, Marcoux, and Hale

Even if Bryan could establish a deprivation of his Eighth Amendment rights, it is clear from the record that Menard, Marcoux, and Hale were not personally involved in this alleged deprivation.[12] As a result, Bryan's Eighth Amendment claims against these DOC supervisors cannot survive summary judgment.

"[P]ersonal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright v. Smith*, 21 F.3d 496, 501 (2d Cir. 1994) (internal quotation marks omitted). "Liability may not be premised on the *respondeat superior* or vicarious liability doctrines, . . . nor may a defendant be liable merely by his connection to the events through links in the chain of command." *Prince v. Edwards*, No. 99CIV.8650(DC), 2000 WL 633382, at *6

---

[12] The personal involvement requirement of § 1983 "does not bar either declaratory or injunctive relief," *Ramirez v. Coughlin*, 919 F. Supp. 617, 623 (N.D.N.Y. 1996); however, as noted above, Bryan lacks standing to bring his claims for injunctive and declaratory relief.

(S.D.N.Y. May 17, 2000) (internal quotation marks and citation omitted).  Instead, a supervisory defendant's personal liability may be shown by evidence that:

> (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir. 1995).[13]

Bryan argues that the DOC supervisors were personally involved because they "exercised deliberate indifference to [his] health and safety" after being "informed of the mistreatment by Medical staff through the Grievance process." (Doc. 72 at 11, ¶¶ 28, 29.)  But "[c]ourts in this circuit have said that the receipt of letters or grievances, by itself, does not amount to personal involvement." *Mateo v. Fischer*, 682 F. Supp. 2d 423, 430 (S.D.N.Y. 2010); *see also Sealey v. Giltner*, 116 F.3d 47, 51 (2d Cir.1997).  Further, there is no indication in the record that any of the named supervisors actually responded to his grievances, further demonstrating their lack of personal involvement in the medical decisions.  *See Liner v. Goord*, 310 F. Supp. 2d 550, 555

---

[13] In *Grullon v. City of New Haven*, 720 F.3d 133 (2d Cir. 2013), the Second Circuit recognized that "the Supreme Court's decision in *Ashcroft v. Iqbal* . . . may have heightened the requirements for showing a supervisor's personal involvement with respect to certain constitutional violations." *Id*. at 139; *see also Rasparado v. Carlone*, 770 F.3d 97, 117 (2d Cir. 2014) (declining to decide the "contours of the supervisory liability test . . . after *Iqbal*").  Still, the Second Circuit has not specifically overruled *Colon*, and this Court continues to treat it as good law.  *See, e.g., Jones v. Pallito*, No. 2:14–cv–199, 2015 WL 2376347, at *5 n.9 (D. Vt. May 18, 2015).  In any event, the Court need not reach *Iqbal*'s impact on *Colon* here because no reasonable juror could find that Menard, Marcoux, and Hale were personally involved in Bryan's medical care, even under *Colon*.  *See Shaw v. Prindle*, 661 F. App'x 16, 18 n.2 (2d Cir. 2016).

36

(W.D.N.Y. 2004) ("[T]he fact that an official ignored a letter alleging unconstitutional conduct is not enough to establish personal involvement." (internal quotation marks omitted)).

Moreover, as noted above, in the context of medical treatment for prisoners, supervisors are generally entitled to rely on the opinions of professional medical staff concerning the treatment of prisoners. *See Joyner v. Greiner*, 195 F. Supp. 2d 500, 506 (S.D.N.Y. 2002) ("[A] prison administrator is permitted to rely upon and be guided by the opinions of medical personnel concerning the proper course of treatment administered to prisoners, and cannot be held to have been personally involved if he does so." (internal quotation marks omitted)). Here, the grievance forms filed by Bryan indicate that a prison official investigated Bryan's complaint and recommended denying the grievance because Bryan had a pending referral for an ENT specialist. (Doc. 4-1 at 4.) The supervisors cannot be held liable under § 1983 for accepting this recommendation, particularly because there is no allegation that the supervisors have medical training. *See Morales v. Fischer*, 46 F. Supp. 3d 239, 255 (W.D.N.Y. 2014) ("It is clear that affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983, particularly if the grievance involves medical care and the reviewer has no medical training." (internal quotation marks omitted)).

Because Bryan cannot establish Menard, Marcoux, and Hale's personal involvement in his medical treatment, his claims against the three supervisors cannot survive summary judgment.

## IV.     Retaliation

Bryan's retaliation claim focuses on Defendant Greg Hale, the superintendent of NWSCF.  (Doc. 72 at 13, ¶¶ 34–35.)  Bryan contends that, after he began filing grievances and after he filed the present § 1983 claim, Hale retaliated by removing Bryan from the VTPSA and by segregating Bryan in a RHU.  (*Id.* ¶ 34.)  But Bryan failed to exhaust his administrative remedies with respect to the retaliation claim and, thus, his claim is procedurally barred by the Prison Litigation Reform Act of 1995.  42 U.S.C. § 1997e.  Moreover, even if Bryan's retaliation claim were not barred, there is no genuine factual dispute of a material fact concerning Hale's alleged retaliation to warrant a trial.  Finally, to the extent that Bryan claims that Menard and Marcoux retaliated against him, Bryan does not adequately allege that either Defendant was personally involved.  As a result, I recommend that Defendant's Motion for Summary Judgment on Bryan's retaliation claim be GRANTED.

### A.     PLRA

First, Defendants correctly assert that Bryan's retaliation claim is barred by 42 U.S.C. § 1997e(a), which precludes a court from reviewing a § 1983 claim that has not been administratively exhausted.

Section § 1997e(a) of the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  Exhaustion is mandatory

and prisoners must "exhaust all 'available' remedies, not just those that meet federal standards." *Woodford v. Ngo*, 548 U.S. 81, 85, 87–88 (2006) (emphasis omitted from first quote). "Proper exhaustion" requires a plaintiff to procedurally exhaust his claims by "compl[ying] with the system's critical procedural rules." *Id.* at 95; *accord Macias v. Zenk*, 495 F.3d 37, 43 (2d Cir. 2007). Further, the term "prison conditions" is broad, and "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002). This broad requirement includes allegations that a prison official retaliated against a prisoner. *See, e.g.*, *Smith v. Costello*, Civ. No. 9:15-CV-0401 (BKS/DJS), 2017 WL 1155811, at *3 (N.D.N.Y. Mar. 3, 2017) (concluding "[prisoner] did not fully exhaust his administrative remedies on his excessive force or retaliation claims"), *report and recommendation adopted*, 2017 WL 1155813 (N.D.N.Y. Mar. 27, 2017).

Because exhaustion is an affirmative defense, once a defendant establishes that a prisoner did not fully exhaust his or her administrative remedies prior to commencing an action in federal court, the prisoner's complaint is subject to dismissal, unless the prisoner can demonstrate that his administrative remedies were unavailable. *Green v. Schmelzle*, 239 F. Supp. 3d 669, 672 (W.D.N.Y. 2017). There are three circumstances when administrative remedies may not be "available" as required by 42 U.S.C. § 1997e(a): (1) when an administrative procedure "operates as a simple dead end—with [prison officials or] officers [who are] unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) when the

administrative scheme is "so opaque" that no ordinary prisoner can navigate it; and (3) when prison administrators prevent inmates from accessing the grievance process. *Ross v. Blake*, 136 S. Ct. 1850, 1859–60 (2016).

In this case, there is no evidence that Bryan sought redress for the alleged retaliation by following the DOC's administrative procedures for inmate complaints. Although Bryan has submitted evidence of grievances that relate to his medical issues, (*see* Doc. 4-1), there is no evidence before the Court of any grievances or other administrative complaints filed by Bryan that address Hale's allegedly retaliatory actions. Nor is there any record in the DOC system of grievances filed by Bryan that complain of retaliation. (Doc. 103-11 at 2 ¶¶ 9–10.) Finally, Bryan does not allege that he submitted any such complaints, nor does he refer to them in his pleadings. As a result, the record is clear that Bryan failed to administratively exhaust his retaliation claim. *See Moreau v. Peterson*, 672 F. App'x 119, 121 (2d Cir. 2017) (finding dismissal of four of six claims was proper because the plaintiff did not file grievances on those four claims); *Shariff v. Coombe*, 655 F. Supp. 2d 274, 287–90 (S.D.N.Y. 2009) (noting that, "in order to maintain a claim in this action[,] each [p]laintiff must have individually exhausted his administrative remedies with respect to that claim" and dismissing claims for which there was no evidence that grievances had ever been filed related to those specific claims).

Instead, Bryan references the grievances he filed relating to his medical issues and states that he should be excused from meeting the exhaustion requirement because the DOC grievance process is a "dead end." (Doc. 104 at 12–13.) Construing

40

this claim in the light most favorable to Bryan, this Court concludes that Bryan is attempting to rely on one of the limited exceptions to administrative exhaustion. *See generally Ross*, 136 S. Ct. at 1859–60. Specifically, he contends that the DOC's administrative procedure "operate[d] as a simple dead end—with [prison officials or] officers [who were] unable or consistently unwilling to provide any relief to aggrieved inmates." *Id.* at 1859. But this conclusory assertion is not supported by the evidence.

    As noted above, there is no evidence that Bryan has filed a single grievance complaining of retaliation, so there is no support for his claim that the entire process is a "dead end." Moreover, Bryan's previous administrative complaints make it clear that the DOC's grievance process is not a dead end. DOC officials responded to Bryan's complaints regarding his ear injury, as evidenced by the plan for resolving Bryan's informal grievance (Doc. 4-1 at 1) and by the investigation and decision regarding his second grievance. (*Id.* at 2–5.) Thus, the DOC prison officials were willing to provide relief to aggrieved inmates. That Bryan never received a response to the grievances he filed with the corrections executive and the commissioner does not demonstrate an unwillingness on the part of the DOC to provide relief, because the process as a whole afforded Bryan an available resolution for his injury complaints. *Compare Ross*, 136 S. Ct. at 1859 (noting that "[s]ome" redress for the wrong is sufficient to establish an available remedy), *with Green*, 239 F. Supp. 3d at 673 (concluding administrative statute of limitations operated as a "dead end"). Finally, to the extent Bryan relies on the other two *Ross* exceptions, the grievance

process was neither "so opaque" as to be inaccessible by an ordinary prisoner, nor was Bryan blocked from accessing his administrative remedies by prison officials. *Ross*, 136 S. Ct. at 1859–60.

Because Bryan failed to exhaust his remedies and that failure cannot be excused, Bryan's retaliation claim is barred under 42 U.S.C. § 1997e(a).

### B.    Merits of Retaliation Claim

Even if Bryan's administrative remedies were unavailable, his retaliation claim would not survive summary judgment because he fails to establish by admissible evidence a causal connection between his protected conduct and the adverse actions allegedly taken by Hale, and that there is no genuine issue of a material fact remaining for trial.

A prisoner's right to file a grievance or a legal action in federal court is constitutionally protected by the First Amendment and Fourteenth Amendment. *Franco*, 854 F.2d at 589.  A prison official may not retaliate against a prisoner for exercising that right.  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  To show such a retaliation, the prisoner "must show that: (1) he [or she] engaged in [constitutionally] protected speech or activity; (2) the defendant took adverse action against him [or her]; and (3) there was a causal connection between the protected speech or activity and the adverse action."  *Washington v. Donahue*, 146 F. Supp. 3d 503, 506 (W.D.N.Y. 2015) (citing *Espinal v. Goord*, 554 F.3d 216, 227 (2d Cir. 2009.)).  To establish the required causal connection, the prisoner's protected conduct must be the "substantial or motivating factor for the adverse actions taken by prison

42

officials." *Bennett v. Goord*, 343 F.3d 133, 137 (2d Cir. 2003). This may be demonstrated by direct or circumstantial evidence, such as temporal proximity between the protected conduct and the adverse action, an inmate's disciplinary record, vindication at a hearing on the adverse action, and statements by the defendant concerning his motivation for the adverse action. *Baskerville v. Blot*, 224 F. Supp. 2d 723, 732 (S.D.N.Y. 2002).

In reviewing a retaliation claim, the Court must be mindful that "[r]etaliation claims by prisoners are prone to abuse since prisoners can claim retaliation for every decision they dislike." *Graham*, 89 F.3d at 79 (internal quotation marks omitted). As a result, a retaliation claim that is "wholly conclusory" may be dismissed. *Id.*; *see also Bennett*, 343 F.3d at 137 ("[B]ecause prisoner retaliation claims are easily fabricated, and accordingly pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration, we are careful to require non-conclusory allegations." (internal quotation marks omitted)). Finally, even if the prisoner establishes a retaliatory action in response to protected conduct, prison officials may evade liability if they demonstrate that they would have taken the adverse action "even in the absence of the protected conduct." *Bennett,* 343 F.3d. at 137 (quoting *Graham*, 89 F.3d at 79.)

In this case, Bryan claims that, after he began filing grievances and after he filed the present § 1983 claim, Hale retaliated by removing Bryan from the VTPSA and by segregating Bryan in a RHU. (Doc. 72 at 13, ¶ 34.) This is a satisfactory allegation that he engaged in protected conduct: by filing multiple DOC grievances

43

and the present suit under 42 U.S.C. § 1983, he was exercising rights protected by the First and Fourteenth Amendments. *Franco*, 854 F.2d at 589. Second, the record undisputedly shows that prison officials took adverse actions against Bryan, he was confined to a RHU twice and terminated from the VTPSA twice. (Doc 103-1 at 6–7, ¶¶ 39, 53); *see Washington*, 146 F. Supp. 3d at 506.

With respect to the third prong, however, the evidence does not establish a material dispute as to whether a causal connection existed between his protected conduct and the adverse action taken against him. Bryan filed his first grievance on August 11, 2015. (Doc. 4-1 at 1.) On August 13, he was put on probation from the VTPSA for his behavior during and after group sessions. (Doc. 103-1 at 8, ¶ 55). He was confined to a RHU from September 4 to September 8, 2015, due to disciplinary rules violations. (Doc. 103-1 at 6, ¶ 40.) On September 10, 2015, he was terminated from the program for these violations. (Doc. 103-1 at 8, ¶ 58.) Bryan filed more grievances in early 2016, and filed the initial complaint in this lawsuit on June 22, 2016. He was again placed in segregation from August 19 to August 25, 2016 (*id.* at 6, ¶ 41), and subsequently terminated from the VTPSA on August 25, 2016. (*Id.* at 9, ¶ 61.)

The record reveals some temporal proximity between Bryan's protected conduct and the adverse actions. *See Baskerville*, 224 F. Supp. 2d at 723. But this circumstantial evidence is significantly outweighed by the evidence showing that Bryan was disciplined because of his poor participation in the VTPSA and his disciplinary rules violations. (*See generally* Doc. 103-9.) For example, the affidavit of

the VTPSA program director states that on September 10, 2015, Bryan was terminated from the VTPSA because he damaged prison property in a fit of anger and because he refused to complete several tasks related to the VTPSA. (*Id.* at 1–2, ¶¶ 5–6.) The director's account is supported by two Notices of Program Termination, which were submitted with Defendants' Motion for Summary Judgment. (*See* Docs. 103-8, 103-10.) Thus, the decision to terminate Bryan from the program was related to his behavior and poor participation in the VTPSA, not his protected conduct. *Cf. Bennett*, 343 F.3d at 137 (finding claims of retaliation meritless where it was clear that behavioral violations, not constitutionally protected activities, were the substantial or motivating factors for adverse actions taken by prison officials).

Moreover, the VTPSA director's affidavit reveals an additional problem with Bryan's retaliation claim against Hale: it was the VTPSA treatment team and the DOC program director of the VTPSA, not Hale, who were ultimately responsible for recommending Bryan's termination from the VTPSA. (Doc. 103-9 at 1, ¶ 1.) As Hale's affidavit confirms, Hale "had nothing to do with the program removal" and Hale has no "authority to remove an inmate from programming." (Doc. 103-2 at 1–2, ¶ 5.) Instead, Hale oversees the security policies at NWSCF that resulted in Bryan's segregation in a RHU. (*Id.* at 1, ¶ 2.) Further, Hale's affidavit states that this segregation occurred after an administrative hearing that conformed with due process, not as a result of any protected activities. (*Id.* at 2, ¶ 11.); *cf. Baskerville*, 224 F. Supp. 2d at 732 (noting evidence of a prisoner's vindication at trial supports claim of retaliation). Nothing in Hale's affidavit or the other evidence suggests that

45

Hale either knew of Bryan's DOC grievances or the present § 1983 action; as a result, this protected conduct cannot be the "substantial or motivating factor" for Bryan's segregation. *Bennett*, 343 F.3d at 137. Moreover, because Bryan counters this substantial evidence only with his conclusory allegations and thin circumstantial evidence, there is no genuine question that no causal connection linked Bryan's protected conduct and the adverse actions allegedly taken by Hale.

Even if Bryan could establish a retaliatory action based on his protected conduct, the record shows that his discipline "would have . . . taken [place] in the absence of improper motives." *Lowrance v. Achtyl*, 20 F.3d 529, 535 (2d Cir. 1994); *Bennett*, 343 F.3d. at 137. Specifically, Bryan has not alleged that he did not commit the conduct upon which his disciplinary rules violations and the VTPSA dismissal were based. *Lowrance*, 20 F.3d at 535 ("[T]he defendants had met their burden because it was undisputed that [the inmate] had in fact committed the prohibited conduct.") Given this fact and Hale's assertion that Bryan was found guilty after an administrative hearing that complied with due process, "the conclusion that the state action would have been taken in the absence of improper motives is 'readily drawn.'" *Id.* (quoting *Sher v. Coughlin*, 739 F.2d 77, 82 (2d Cir. 1984). Thus, his retaliatory claim fails on this alternate basis and summary judgment is proper.

## C.    Personal Involvement of Menard and Marcoux

Finally, to the extent that Bryan's retaliatory claim is based on the actions of Menard and Marcoux, they cannot be held liable because there is no evidence pointing to their personal involvement in the adverse actions against Bryan. As

46

stated above, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Wright*, 21 F.3d at 501 (internal quotation marks omitted). Further, prison officials cannot be liable solely by virtue of their supervisory positions. *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985). Connecting alleged actions to people at the top of the prison "chain of command" is not enough—the prisoner must show that there is a causal connection between the acts of a defendant and his alleged injuries. *Id.*; *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986). Here, other than Menard and Marcoux's supervisory positions, Bryan does not present any evidence of their personal involvement in the alleged retaliatory acts. Because this is insufficient as a matter of law, *Ayers*, 780 F.2d at 210, Bryan's retaliatory claims against Menard and Marcoux must be dismissed.

## V.    Leave to Amend

Finally, I recommend that the Court refrain from granting Bryan leave to amend his complaint for a third time. Although a *pro se* plaintiff should ordinarily be given the opportunity "to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated," *Shomo v. City of New York*, 579 F.3d 176, 183 (2d Cir. 2009) (internal quotation marks omitted), "a district court may deny leave to amend when amendment would be futile." *Boddie v. New York State Div. of Parole*, No. 08-cv-911 (KAM)(LB), 2009 WL 1033786, at *5 (E.D.N.Y. Apr. 17, 2009) (internal quotation marks omitted); *see also Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (holding that a "futile request to replead," even by a

pro se litigant, "should be denied").  Amendment is futile when the cause of action is substantively flawed and better pleading will not cure its defects.  *Id.*; *see also Health-Chem Corp. v. Baker*, 915 F.2d 805, 810 (2d Cir. 1990).

Bryan has had two opportunities to amend his complaint in this matter.  (*See* Docs. 4, 13, 20, 68, 72.)  Further amendment of Bryan's claims against Defendants would be futile for the reasons explained above.  I therefore recommend that the Court decline to grant Bryan leave to amend his second amended complaint.

## Conclusion

For the foregoing reasons, I recommend that the Court GRANT Defendants' Motion for Summary Judgment (Doc. 103) and DISMISS the claims alleged in the Second Amended Complaint, with prejudice.

Dated at Burlington, in the District of Vermont, this 25th day of January 2018.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within 14 days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b)(2); L.R. 72(c).  Failure to timely file such objections "operates as a waiver of any further judicial review of the magistrate's decision." *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).